No. 58,811

STATE OF KANSAS, *Appellee*, v. LOIS WHEATON, *Appellant*.

(729 P.2d 1183)

Opinion filed December 5, 1986.

*Jessica Kunen*, deputy appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the brief for the appellant.

*Robert A. Fox*, assistant county attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Timothy J. Chambers*, county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal by the defendant from her conviction of aggravated robbery (K.S.A. 21-3427) by a Reno County jury. Two issues are raised on appeal: whether the trial court erred in excluding expert testimony on eyewitness identification and in failing to question a juror concerning her ability to serve on the jury panel.

At approximately 11:50 p.m. on September 20, 1984, a woman entered a Kwik Shop at 17th and Lorraine in Hutchinson, Kansas. She looked at the clock, looked around the store, and eventually bought some Salem Light cigarettes. Kimberly Danowitz, the clerk who waited on this woman, described her to police as a short, heavyset, black female with short hair, wearing a shirt with a marijuana leaf on it.

At approximately 3:05 a.m., on September 21, 1984, the defendant was seen at the Stop 'N Shop at "A" and Adams. Patricia

Herzfeld, the clerk on duty, knew the defendant because the defendant shopped there often. She stated the defendant was wearing a short-sleeved royal blue sweat shirt, grey sweat pants, and grey tennis shoes, and didn't appear to be drunk or ill. The defendant asked about breakfast food but decided to buy it elsewhere and left.

At approximately 3:20 a.m. that same morning, a lady entered the front door of the Stop 'N Shop at 30th and Plum just as the clerk, Carol Stout, was coming from the back room. The lady purchased a package of Kool cigarettes, and when Ms. Stout turned around to give the customer her change, there was a gun pointing at Ms. Stout's stomach. After Ms. Stout gave her approximately $150, the robber ordered Ms. Stout from behind the counter, held the gun to her back, walked her to the bathroom, and ordered her to remain inside. She remained in the bathroom ten minutes and then called the police. When the police arrived, Ms. Stout described the robber as a black female, between 36 to 42 years old standing 4'9" to 4'10", weighing 180-200 pounds with short hair, very large eyes and wearing a blue short-sleeved T-shirt, grey sweat pants, and tennis shoes. Several hours later, Detective Loren Smith attempted to make a composite picture from Ms. Stout's description of the robber. Ms. Stout was not pleased with the outcome of the composite, stating the eyes were not right, so Detective Loren showed her a series of photographs. Prior to showing her the photographs, the detective cautioned her that the photographs may have been taken years ago and to allow for age or glasses. The first group contained six photographs of black females, not including the defendant, all wearing glasses. Ms. Stout was shown a second group and selected the fourth picture, the defendant, as the robber. Later, at trial, Ms. Stout made a positive in-court identification of the defendant as the robber.

The defendant is a black woman, 40 years of age, approximately 5'5" tall and weighs 180 pounds. A search of her apartment revealed no gun or money. However, at the time the defendant's apartment was searched, the defendant was wearing a blue sweat shirt with a marijuana leaf on the front and a pair of grey sweat pants. These pieces of clothing were recovered from the defendant and, at trial, when asked whether they could identify the sweat shirt, Ms. Danowitz recognized it as the one

the defendant was wearing; Ms. Herzfeld recognized the sweat pants as those the defendant was wearing but felt the sweat shirt was too short in length; and Ms. Stout stated the color of the sweat shirt looked familiar but the marijuana leaf design did not. However, when the sweat shirt was turned inside out, it looked more familiar to her, as she remembered the rough-edged shoulder seams.

A friend of the defendant's, Irene Hubbs, testified that she and the defendant had moved clothes to the defendant's house around midnight. Ms. Hubbs then left. The defendant testified she then stayed at home with her nephew, drinking and playing dominos for almost two hours. They stopped playing dominos around 2:30 a.m., at which time the defendant went to the Stop 'N Shop at "A" and Adams for cigarettes. When Ms. Hubbs let herself into the house, at approximately 4:00 a.m., the defendant had returned home and was in the bathroom sick from drinking. Ms. Hubbs then helped the defendant into bed.

The defendant was charged and convicted of aggravated robbery and sentenced to from eight to twenty years. She brings this direct appeal.

The first issue asserted on appeal is that the defendant was denied her Sixth Amendment right under the federal Constitution to obtain witnesses in her favor when the district court ruled that expert testimony concerning eyewitness identification was inadmissible.

Prior to trial, defense counsel filed a motion requesting $2,000 in funds to hire an expert, Dr. Geoffrey R. Loftus, to testify on eyewitness identification. Defense counsel also sought a ruling on the admissibility of that evidence. At a hearing on that motion, defense counsel stated the expert testimony would be offered to explain the factors concerning the accuracy of eyewitness identification when a person is under stress and when there is a cross-racial identification, and the testimony would not be offered to tell the jury whether an eyewitness is right or wrong. The district court ruled the testimony was inadmissible pursuant to *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981), and denied the defendant's request for funds.

In *State v. Warren*, 230 Kan. 385, this court ruled the potential problems of mistaken identification by an eyewitness would be better solved by cautionary jury instructions, rather than admit-

ting into evidence expert testimony on the scientific and psychological aspects of eyewitness identification. This court held a cautionary instruction should be given advising the jury of factors to consider in weighing the credibility of the eyewitness identification testimony when two conditions are met: (1) the eyewitness identification is a critical part of the prosecution's case, and (2) there is a serious question regarding the reliability of the identification. 230 Kan. at 397. PIK Crim. 2d 52.20 embodies the cautionary instruction and sets forth the factors which could affect the accuracy of the identification made by an eyewitness:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting.

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence.

"3. Whether the witness had observed the defendant[s] on earlier occasions.

"4. Whether a significant amount of time elapsed between the crime charged and any later identification.

"5. Whether the witness ever failed to identify the defendant[s] or made any inconsistent identification.

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused.

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

A cautionary *Warren* instruction *was given* in the instant case.

The defendant in *State v. Reynolds*, 230 Kan. 532, 639 P.2d 461 (1982), made a similar argument to this court as the defendant makes today: the district court's refusal to order funds for the hiring of an eyewitness identification expert violated his due process rights by denying him the right to prepare his defense adequately. Based upon *Warren*, we found the expert testimony on the subject of eyewitness identification was inadmissible. 230 Kan. at 534. In response to the argument that a cross-racial identification was made by an eyewitness under stress at the time of the incident, we recognized those factors were important but noted they could have been and were elicited during other testimony. 230 Kan. at 535. The district court was found not to have abused its discretion in refusing to authorize funds for the hiring of an expert on eyewitness identification.

The precise issue presented to this court is whether we are

willing to now overrule *Warren* and *Reynolds*, and allow expert testimony on eyewitness identification.

The defendant asserts that (1) most studies in the area of eyewitness identification have been conducted since *Warren*, (2) there is a recent trend toward allowing such testimony, and (3) cross-examination of the eyewitness, closing argument, and cautionary jury instructions are not sufficiently curative of the problems surrounding eyewitness identification.

The defendant cites four state court decisions and three federal circuit court decisions which have recently allowed admitting into evidence expert testimony on the reliability of eyewitness identification. The Arizona Supreme Court in *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983), found the district court erred in refusing to allow Dr. Elizabeth Loftus to testify concerning factors which affect the accuracy of eyewitness identification. The defendant was apprehended and prosecuted on the basis of eyewitness identification made by two individuals, a brother and a sister, one year after the date of the crime. Soon after the crime the brother had pointed to a picture of a man named Logan, stating the man resembled one of the perpetrators. One of the photographic lineups also shown to the brother contained the defendant's picture, but the defendant was not then identified. One year later, the brother was shown a photographic lineup which contained the defendant's picture and a codefendant's picture previously identified, but no picture of Logan. The brother identified the defendant as the perpetrator as did the sister separately. The Arizona court stated it would not assume that ordinary jurors would be aware of the impact of the factors on eyewitness identification proffered by Dr. Loftus: (1) the "forgetting curve" (forgetting occurs very quickly and then levels off, therefore, a prompt identification is more trustworthy than a delayed identification); (2) problems of "unconscious transfer" (where a witness confuses a person seen in one situation with a person seen in a different situation); (3) the confidence expressed by the eyewitness has no relationship to the accuracy of the identification; (4) post-event information is frequently incorporated into identifications; and, (5) the "feedback factor" (through discussions with other witnesses, the eyewitness can reinforce his or her individual identification). In ruling that the testimony of Dr. Loftus was admissible, the court stated

it was not opening the floodgates for expert evidence on the subject of eyewitness identification, but was allowing it under the peculiar facts before it. Cases subsequent to *Chapple* illustrate that the decision to allow general testimony as to factors affecting eyewitness identification is within the sound discretion of the trial court and limit *Chapple* to the peculiar circumstances of the case, including the fact that the eyewitness identification was all that tied the defendant to the crime. *State v. Via*, 146 Ariz. 108, 704 P.2d 238 (1985); *State v. Rodriquez*, 145 Ariz. 157, 700 P.2d 855 (1985); *State v. Poland*, 144 Ariz. 388, 698 P.2d 183 (1985).

The defendant cites *United States v. Smith*, 736 F.2d 1103 (6th Cir.), *cert. denied* 469 U.S. 868 (1984), where the defendant was charged with armed robbery of a bank. Three weeks after the robbery, the bank employees were shown a photographic lineup which included the defendant's picture. None of the employees identified the defendant. Four months later, three employees identified the defendant in a lineup. The 6th Circuit ruled it was harmless error for the district court to exclude an expert's testimony on eyewitness identification in light of the facts that three eyewitnesses identified the defendant and his palmprint was found at the bank.

The California Supreme Court, following *Chapple*, has ruled that the psychological factors affecting the accuracy of eyewitness identification were beyond common experience and expert testimony would assist the jury. *People v. McDonald*, 37 Cal. 3d 351, 690 P.2d 709, 721 (1984). The defendant in *McDonald* was convicted of murdering a restaurant worker on payday at a busy intersection in downtown Long Beach, California. With varying degrees of certainty, seven eyewitnesses identified the defendant as the gunman; however, one eyewitness stated the defendant was not the gunman. Six witnesses for the defense testified the defendant was in another state on the date of the crime. The California court held expert testimony is allowed when:

"an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury . . . ." 37 Cal. 3d at 377.

Based upon the above three cases the Third Circuit estab-

lished a two-part test for determining whether expert testimony on the accuracy of eyewitness identifications is admissible in *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985). First, in an in limine proceeding, the evidence must survive a balancing test between two factors: the testimony's potential to aid the jury and the likelihood it may mislead the jury. Second, a specific proffer must show that "scientific research has established that particular features of the eyewitness identifications involved may have impaired the accuracy of those identifications." 753 F.2d at 1226.

A New York County Court followed *Chapple, Smith, McDonald*, and *Downing* in *People v. Brooks*, 128 Misc. 2d 608, 490 N.Y.S. 2d 692 (1985), where a defendant requested a ruling in limine on the admissibility of expert testimony on eyewitness identification. The New York court ruled the expert could take the stand as a live learned treatise where he would be called upon "to draw from all of the scientific studies the conclusion that certain factors are or are not relevant to determining the reliability of eyewitness identification testimony." 128 Misc. 2d at 617.

In *State v. Buell*, 22 Ohio St. 3d 124, 489 N.E.2d 795 (1986), the Supreme Court of Ohio ruled that expert testimony concerning factors which may impair the accuracy of eyewitness identification is admissible. The court went on to rule, however, that the trial court did not abuse its discretion in excluding such testimony because the evidence against the defendant consisted primarily of physical evidence rather than eyewitness identification. 22 Ohio St. 3d at 133.

Finally, the defendant cites *United States v. Moore*, 786 F.2d 1308 (5th Cir. 1986), where the federal court recognized that the admission of expert testimony on eyewitness identification is proper in certain cases, but ruled that under the facts before it, the trial court did not err in excluding such testimony because the evidence against the defendant was overwhelming without considering the eyewitness identification testimony.

While there does seem to be a recent trend toward allowing the admissibility of expert testimony on eyewitness identification, the following cases upheld the trial courts' denial of admissibility. *United States v. Brewer*, 783 F.2d 841 (9th Cir. 1986); *United States v. Purham*, 725 F.2d 450 (8th Cir. 1984);

*United States v. Thevis*, 665 F.2d 616, *reh. denied* 671 F.2d 1379 (5th Cir. 1982); *United States v. Sims*, 617 F.2d 1371 (9th Cir. 1980); *United States v. Fosher*, 590 F.2d 381 (1st Cir. 1979); *United States v. Watson*, 587 F.2d 365 (7th Cir. 1978), *cert. denied* 439 U.S. 1132 (1979); *United States v. Brown*, 540 F.2d 1048 (10th Cir. 1976), *cert. denied* 429 U.S. 1100 (1977); *United States v. Brown*, 501 F.2d 146 (9th Cir. 1974); *United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973); *Perry v. State*, 277 Ark. 357, 642 S.W.2d 865 (1982); *Caldwell v. State*, 267 Ark. 1053, 594 S.W.2d 24 (1980); *People v. Lawson*, 37 Colo. App. 442, 551 P.2d 206 (1976); *State v. Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986); *Taylor v. United States*, 451 A.2d 859 (D.C. 1982), *cert. denied* 461 U.S. 936 (1983); *Jackson v. United States*, 420 A.2d 1202 (D.C. 1979); *Dyas v. United States*, 376 A.2d 827 (D.C.), *cert. denied* 434 U.S. 973 (1977); *Johnson v. State*, 438 So. 2d 774 (Fla. 1983), *cert. denied* 465 U.S. 1051 (1984); *Nelson v. State*, 362 So. 2d 1017 (Fla. Dist. App. 1978); *Jones v. State*, 232 Ga. 762, 208 S.E.2d 850 (1974);*Mitchell v. State*, 176 Ga. App. 32, 335 S.E.2d 150 (1985); *State v. Kay*, 108 Idaho 661, 701 P.2d 281 (1985); *State v. Hoisington*, 104 Idaho 153, 657 P.2d 17 (1983); *People v. Clark*, 124 Ill. App. 3d 14, 463 N.E.2d 981 (1984); *People v. Brown*, 100 Ill. App. 3d 57, 426 N.E.2d 575 (1981); *People v. Dixon*, 87 Ill. App. 3d 814, 410 N.E.2d 252 (1980); *Pankey v. Commonwealth*, 485 S.W.2d 513 (Ky. 1972); *State v. Stucke*, 419 So. 2d 939 (La. 1982); *State v. Coleman*, 486 So. 2d 995 (La. App. 1986); *State v. Fernald*, 397 A.2d 194 (Me. 1979); *Commonwealth v. Francis*, 390 Mass. 89, 453 N.E.2d 1204 (1983); *State v. Saxton*, 331 N.W.2d 240 (Minn. 1983); *State v. Helterbridle*, 301 N.W.2d 545 (Minn. 1980); *State v. Ammons*, 208 Neb. 812, 305 N.W.2d 812 (1981); *Porter v. State*, 94 Nev. 142, 576 P.2d 275 (1978); *State v. Porraro*, 121 R.I. 882, 404 A.2d 465 (1979); *State v. Wooden*, 658 S.W.2d 553 (Tenn. Crim. App. 1983); *Welch v. State*, 677 S.W.2d 562 (Tex. App. 1984); *State v. Onorato*, 142 Vt. 99, 453 A.2d 393 (1982).

The defendant argues most studies on the subject of eyewitness identification have been performed since the *Warren* decision in 1981. Whether or not that is true, we continue to believe that to allow expert testimony on the subject of the reliability of eyewitness testimony is not the answer to the problems surrounding eyewitness identifications. The cautionary instruction

sets forth the factors for the jury to consider in evaluating the eyewitness' testimony. The defendant argues these instructions do not explain to the jury how to use the factors, *e.g.*, that threat of violence decreases the accuracy of the identification rather than increases its accuracy, as many laymen believe. Extensive cross-examination of the eyewitness and persuasive argument by defense counsel can highlight any inaccuracies which could result because the eyewitness was being threatened or was under stress. *State v. Warren*, 230 Kan. at 395. We find that even under *Chapple*, the trial court did not err in refusing to allow the expert testimony. Here the eyewitness identified the defendant from a photographic lineup within hours after the crime. Two other witnesses saw the defendant in their convenience stores within a three-hour period of the crime. The eyewitness stated the defendant was wearing a blue sweat shirt and grey sweat pants. When the defendant's apartment was searched the defendant was wearing a blue sweat shirt and grey sweat pants. The trial court did not err in ruling the expert testimony on eyewitness identification was inadmissible.

Next the defendant argues the district court erred by failing to question a juror concerning her ability to serve on the jury panel. During lunch recess, right after voir dire, one of the jurors approached the defense counsel and asked how to be excused from the jury. Defense counsel told her to let the judge know her feelings. Defense counsel also reported the conversation to the court. The jury had been instructed by the court at orientation that if they had any problem they should contact the bailiff. The juror never contacted the bailiff or the judge. Defense counsel never objected to the juror remaining on the jury after their conversation until after the verdict was rendered. In a motion for a new trial, the defendant argued she was denied a trial by a fair and impartial jury due to the juror's behavior.

The precise issue presented is whether the trial court has a duty to question a juror once defense counsel has informed the court that a juror inquired of defense counsel how to be excused from the jury and the juror is told to contact the court but fails to do so.

In both civil and criminal cases, juror misconduct is not a ground for reversal, new trial, or mistrial unless it is shown to have substantially prejudiced a party's rights. The burden of

proof is on the party claiming the prejudice. *State v. Fenton,* 228 Kan. 658, 664, 620 P.2d 813 (1980); *State v. Jakeway,* 221 Kan. 142, 148, 558 P.2d 113 (1976); *State v. Arney,* 218 Kan. 369, 371-72, 544 P.2d 334 (1975); *Roy v. State,* 213 Kan. 30, 32, 514 P.2d 832 (1973); *State v. Duncan,* 3 Kan. App. 2d 271, 275, 593 P.2d 427 (1979). Juror misconduct includes communications with jurors from outsiders, witnesses, bailiffs, or judges. *State v. Fenton,* 228 Kan. at 664.

In Kansas, a rule has been adopted that where alleged juror misconduct claimed as prejudicial is known by the party or his counsel before the verdict is rendered, and no objection is made nor is the matter brought to the court's attention, the party cannot later assert the misconduct as grounds for a new trial. *State v. Buggs,* 219 Kan. 203, 207, 547 P.2d 720 (1976); *Roy v. State,* 213 Kan. at 32. The reasons for such a rule were stated in *Buggs* as follows:

"If the alleged misconduct is brought to the court's attention a hearing may be held and the situation remedied, if that is possible. If not, a mistrial may be declared immediately without wasting the time and expense required to complete the trial. The rule is a corollary of the contemporaneous objection rule as to evidence (K.S.A. 60-404; *State v. Estes,* 216 Kan. 382, 532 P.2d 1283) and the requirement of an objection to erroneous instructions (K.S.A. 60-251[b]; *Apperson v. Security State Bank,* 215 Kan. 724, 528 P.2d 1211). A party is not permitted to remain silent in the face of known error, gamble on the verdict, and show his hole card only if he loses." 219 Kan. at 208.

Here, all defense counsel did was inform the trial court of her brief conversation with the juror. When informing the trial court of the conversation, defense counsel never objected or argued that the juror could be inattentive, prejudiced, or biased due to her inquiry. During the trial, defense counsel never objected to the juror remaining on the jury, nor did she inquire of the trial court whether it had questioned the juror. After the verdict was rendered, in a motion for a new trial, defense counsel argued the juror should have been questioned by the court. Here, a failure to object to the court's failure to question the juror forecloses the defendant's right to appeal on this issue. See generally *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985).

The judgment of the lower court is affirmed.