**Earl William CAMPBELL, Petitioner,**

v.

**The PEOPLE of the State of
Colorado, Respondent.**

**Nos. 90SC86, 90SC95.**

Supreme Court of Colorado,
En Banc.

June 24, 1991.

———

Miller, Hale & Harrison, Daniel C. Hale, Robert Bruce Miller, Boulder, for petitioner.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Paul Koehler, Asst. Atty., Gen., Denver, for respondent.

Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decisions in two separate cases, consolidated here, against the same defendant, Earl William Campbell, on the admissibility of expert testimony concerning the reliability of eyewitness identification. In *People v. Campbell*, 785 P.2d 153 (Colo. App.1989), the court reversed the defendant's conviction on grounds not before us [1] and remanded the case back to the trial court with directions. Because the admissibility of the proffered expert testimony on eyewitness identification was likely to arise at retrial, the court addressed this issue and concluded that the trial court did not err by excluding such testimony. In *People v. Campbell*, No. 87CA1956 (Colo.App. Nov. 30, 1989) (not selected for publication), the court reached the same conclusion and affirmed the defendant's judgment of conviction. We reverse the court of appeals holding and remand with directions on this issue in *People v. Campbell*, 785 P.2d 153 (Colo.App.1989), and remand with directions to vacate the judgment and return to the trial court in *People v. Campbell*, No. 87CA1956 (Colo.App. Nov. 30, 1989).

I.

The defendant's convictions arose from two separate robbery episodes in October 1986. The first robbery occurred at approximately 6:15 p.m. on October 3, 1986, at a convenience store in Franktown, Colorado. There were two witnesses to the robbery: Rebecca Herron (Herron), a store clerk, and Tammy Hill (Hill), a customer. At approximately 6:00 p.m., Herron took a short break from work in the back storage room. While on her break, Herron observed a white male wearing a blue stocking cap and a blue coat peer quickly into the storage room. Shortly thereafter, Herron returned to work to relieve the other cashier on duty. As she was approaching the cash register, she again saw the man

with the blue hat wandering through the store. Meanwhile, Tammy Hill had entered the store with her two children. She too noticed the man as they passed each other in the store aisles. Eventually, the man approached the cash register and placed several items on the counter. He then pulled a gun from his pants, pointed it at Herron, and demanded all the store's money. As Herron was placing the money from the store's safe in a brown bag, Hill approached the counter with her children. The robber turned to her, placed his hand on her arm, and told her to take her children to the candy aisle. Hill never saw the man's gun, but she grabbed her children and took them to the back of the store. The robber then told Herron that he was going to shoot her. He pointed the gun at her and fired. The bullet missed Herron, ricocheted off the counter, and was later discovered lodged in the ceiling. After firing his gun, the robber fled from the store.

That evening, Herron and Hill each assisted Deputy Sheriff Gary Robinson in preparing separate composites of the robber. On October 24, 1986, Detective Dale Row showed a photographic lineup to Herron and Hill at different times. They each unequivocally selected the defendant from the photographic array. An information was filed against the defendant on October 31, 1986, for the October 3 robbery, charging him with attempted first-degree murder, aggravated robbery, theft, and one crime-of-violence count.

On November 24, 1986, a separate three-count information was filed against the defendant for an armed robbery at a Safeway store in Parker, Colorado, on October 10, 1986. There were also two witnesses to that robbery: Lester Palmer (Palmer), the store's manager, and Laura Christine Kelsay (Kelsay), a Safeway employee. The October 10 robbery occurred at approximately 6:15 p.m. Kelsey was working in the store's customer service room and was cashing Palmer's paycheck when a man approached Palmer from behind. The man

---

**1.** The court of appeals reversed and remanded for a new trial based on its conclusion that the trial court abused its discretion in finding that the defendant had waived his right to be present during trial and thus conducting the trial *in abstentia. People v. Campbell*, 785 P.2d at 154.

asked Palmer if he was the store manager. Palmer turned to the man and acknowledged that he was. The man then told Palmer that he had a gun and ordered him to retrieve the store's money. Palmer told Kelsay that they were being robbed and that he would handle the matter. As Palmer handed the robber the money in the store's safe, the robber exposed the handle of the gun he was holding in his right pocket and warned Palmer that he would shoot if any attempt to sound an alarm was made. After receiving Palmer's word that he could escape unhindered, the robber fled from the store.

That evening, a police sketch artist prepared a composite drawing of the robber based on Palmer's description. Approximately one week after the robbery, Officer John Hindes requested that Palmer view a photographic lineup. Palmer was unable to make a positive identification and asked if he could see one of the suspects in the lineup in person. His request was not fulfilled. The following week, Officer Vernon Tolson asked Palmer to view another photographic lineup, from which he made an immediate positive identification of the defendant as the robber.

Kelsay was not asked initially to view a photographic lineup, nor did she assist in preparing a composite. Instead, two to three days after the robbery, Officer Hindes showed her three photographs, none of which depicted the defendant and two of which were photographs of a Gerald Wayne Baker. Kelsay indicated that she was ninety-percent sure that the two pictures of Gerald Baker resembled the robber. She was not positive, however, because she had only seen the robber's profile and the pictures displayed front-view shots. On October 21, 1986, Officer Tolson asked Kelsay to view the same six-picture photographic lineup that he had shown to Palmer. She hesitantly selected a photograph that was not the defendant, primarily because the subject wore glasses similar to the pair worn by the robber. In making this selection, Kelsay again stated that she was unsure about her choice because it was

a front view of the subject and she had only seen the robber's profile. A second photographic array was subsequently shown to Kelsay consisting of profile shots of the same six subjects. She then positively identified the defendant as the robber. Prior to viewing any photographs, Kelsay had seen the composite drawing prepared with Palmer's assistance. Kelsay testified that she had voiced her concerns to Palmer about the accuracy of the composite drawing, stating that she thought the robber's glasses were different and that his face was more angular and his chin wider than the composite's depiction of the robber.

Following the defendant's arrest, combined motions hearings were held for both prosecutions against the defendant, which addressed the defendant's motion for appointment of an identification expert and his motion to suppress identification. All four of the eyewitnesses to the October 3 and October 10 robberies made positive in-court identifications of the defendant as the robber during these hearings. On March 24, 1987, the trial court granted the defendant's motion to appoint an identification expert. The court subsequently denied the defendant's motion to suppress identification on April 8, 1987, finding that the identification procedures used were not unnecessarily suggestive so as to render the in-court identification unreliable.

The trial for the October 3 robbery began on May 5, 1987. The prosecution's only evidence of guilt against the defendant was the testimony by the two eyewitnesses, Herron and Hill. No identification could be made from fingerprints that were lifted from the door of the convenience store following the robbery. Defense counsel's opening statement and cross-examination focused on the theory that the eyewitnesses to the crime had misidentified the defendant as the robber.[2] During trial, the defendant presented two alibi witnesses to establish that the defendant was looking at a rental home with a realtor in Woodland Park, Colorado, at the time of the offense. Defense counsel also

2. No record was made of defense counsel's statements to the jury during closing argument.

sought to introduce testimony from Dr. Edith Greene, a psychology professor, on the reliability of eyewitness identification. Dr. Greene was prepared to testify that (1) contrary to popular belief, high levels of stress impair rather than improve memory; (2) the tendency of victims to focus on the weapon used during the crime reduces their ability to recall details about the offender's appearance; (3) there is no correlation between a witness's expression of confidence in his or her identification of a suspect and the accuracy of that witness's recollection; and (4) a witness's viewing of a composite drawing or photograph can influence the witness's memory of the criminal. Following defense counsel's offer of proof, the trial court denied admission of Dr. Greene's testimony. The court relied on the general acceptance standard for novel scientific evidence set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923), to find that Dr. Greene's proffered testimony was not based on "scientifically established standard[s]," and further found that the proposed testimony would invade the province of the jury in evaluating witness credibility.

The trial for the October 10 robbery began on July 8, 1987. As in the first trial, no identification could be made from a set of latent fingerprints lifted from the crime scene. The defense again relied on a theory of misidentification, but this time no alibi witnesses were presented. On the admissibility of Dr. Greene's proffered testimony, the trial court took judicial notice of its prior ruling and excluded the evidence. The defendant was found guilty on all counts at both trials. Based on his habitual criminal status, he received a mandatory life sentence in each case, to run consecutively.

In both cases, the court of appeals disagreed with the trial court's application of *Frye*, but nevertheless ruled that the trial court did not err in excluding Dr. Greene's testimony because evidence on the reliability of eyewitness identification is a matter within the common knowledge of jurors. *People v. Campbell*, 785 P.2d at 155; *People v. Campbell*, No. 87CA1956, slip op. at 2.

II.

In this consolidated review, the sole issue before us is whether the trial court erred by excluding the testimony of the defendant's expert witness, Dr. Greene, on the reliability of eyewitness identifications. "A trial court has broad discretion to determine the admissibility of expert testimony, and appellate courts may not overturn a trial court's ruling unless it is manifestly erroneous." *People v. Williams*, 790 P.2d 796, 798 (Colo.1990). We must determine whether the trial court applied the wrong standard to exclude Dr. Greene's testimony in both cases against the defendant.

A.

Although this court has never addressed the issue of the admissibility of expert testimony on the reliability of eyewitness identifications, the problem has received substantial attention in other jurisdictions. Federal and state courts have almost uniformly upheld the trial court's exclusion of this type of testimony.[3] Our own court of

3. *See, e.g., United States v. Thevis*, 665 F.2d 616, 641 (5th Cir.1982); *United States v. Fosher*, 590 F.2d 381, 382–84 (1st Cir.1979); *United States v. Watson*, 587 F.2d 365, 368–69 (7th Cir.1978); *United States v. Brown*, 540 F.2d 1048, 1053–54 (10th Cir.1976); *United States v. Amaral*, 488 F.2d 1148, 1152–53 (9th Cir.1973); *United States v. Collins*, 395 F.Supp. 629, 635–37 (M.D.Pa. 1975), *aff'd*, 523 F.2d 1051 (3d Cir.1975); *State v. Kemp*, 199 Conn. 473, 477–78, 507 A.2d 1387, 1389–90 (1986); *Dyas v. United States*, 376 A.2d 827, 831–32 (D.C.1977); *Lewis v. State*, 572 So.2d 908, 911 (Fla.1990); *Jones v. State*, 232 Ga. 762, 764–66, 208 S.E.2d 850, 852–54 (1974); *State v. Hoisington*, 104 Idaho 153, 165, 657 P.2d 17, 29 (1983); *State v. Wheaton*, 240 Kan. 345, 347–51, 729 P.2d 1183, 1185–88 (1986); *Pankey v. Commonwealth*, 485 S.W.2d 513, 522 (Ky. 1972); *State v. Stucke*, 419 So.2d 939, 944–45 (La.1982); *State v. Rich*, 549 A.2d 742, 743–44 (Me.1988); *Commonwealth v. Francis*, 390 Mass. 89, 100–01, 453 N.E.2d 1204, 1210 (1983); *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980); *State v. Lawhorn*, 762 S.W.2d 820, 821–23 (Mo.1988); *State v. Ammons*, 208 Neb. 812, 813, 305 N.W.2d 812, 814 (1981); *Porter v. State*, 94 Nev. 142, 146–48, 576 P.2d 275, 278–79 (1978); *State v. Long*, 119 N.J. 439, 446, 575 A.2d 435, 462–63 (1990); *State v. Porraro*, 121 R.I. 882, 892, 404 A.2d 465, 471 (1979); *State v.*

appeals has similarly affirmed the trial court's exclusion of such evidence on two previous occasions in *People v. Lawson,* 37 Colo.App. 442, 445, 551 P.2d 206, 208–09 (1976), and *People v. Beaver,* 725 P.2d 96, 99–100 (Colo.App.1986), wherein the court of appeals held that the trial court did not abuse its discretion in excluding the expert's testimony because the tendered evidence on eyewitness identification was within the experience and common knowledge of the jurors. *Lawson,* 37 Colo.App. at 445, 551 P.2d at 209; *Beaver,* 725 P.2d at 99–100.

In addition to the view that the testimony is not beyond the common experience of jurors, courts have advanced other rationales as well to uphold the exclusion of expert testimony on eyewitness identification. Some courts have denied admission of such evidence because it "invades the province of the jury" or "usurps the function of the jury" in evaluating witness credibility.[4] Other courts have concluded that the proffered testimony is not in conformity with a scientific principle that has been generally accepted by experts in the field pursuant to the test developed in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923).[5] Finally, some courts have reasoned that such expert testimony has the potential to unduly prejudice the jury, mislead the jury, or waste time.[6] As an alternative to the introduction of expert testimony, courts have asserted that the inherent problems with eyewitness identifications can be adequately addressed through effective cross-examination and in closing argument.[7] Moreover, some courts have buttressed this reliance on cross-examination with the requirement that the defense be allowed judicial instructions informing the jury about factors that influence eyewitness identification.[8]

*Onorato,* 142 Vt. 99, 102, 453 A.2d 393, 395–96 (1982); *State v. Coe,* 109 Wash.2d 832, ——, 750 P.2d 208, 214 (1988).

**4.** *See, e.g., United States v. Brown,* 540 F.2d 1048, 1054 (10th Cir.1976); *State v. Poland,* 144 Ariz. 388, 398, 698 P.2d 183, 193 (1985).

**5.** Specifically, the *Frye* court stated:
[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field to which it belongs.
*Frye,* 293 F. at 1014. *See, e.g., United States v. Christophe,* 833 F.2d 1296, 1299 (9th Cir.1987); *United States v. Watson,* 587 F.2d 365, 369 (7th Cir.1978).

**6.** *See, e.g., United States v. Thevis,* 665 F.2d 616, 641 (5th Cir.1982); *State v. Ammons,* 208 Neb. 812, 813, 305 N.W.2d 812, 814 (1981); *Porter v. State,* 94 Nev. 142, 148, 576 P.2d 275, 278–79 (1978). This argument includes the concern that the introduction of the testimony would lead to an unduly confusing or time-consuming "battle of the experts."

**7.** *See, e.g., State v. Wheaton,* 240 Kan. 345, 351–52, 729 P.2d 1183, 1188 (1986); *State v. Lawhorn,* 762 S.W.2d 820, 823 (Mo.1988).

**8.** *See, e.g., United States v. Collins,* 395 F.Supp. 629, 636–37 (M.D.Pa.1975) (psychologist's "testimony would have done little more than add a scientific luster to the facts and ideas which were amply presented by cross-examination,

counsel's argument to the jury, and the charge of the Court"); *State v. Whitmill,* 780 S.W.2d 45, 47 (Mo.1989).

*United States v. Telfaire,* 469 F.2d 552 (D.C. Cir.1972) is the leading case advocating the use of specific instructions on the factors that influence eyewitness identification. This court, however, has consistently held that when the defendant's theory of the case is mistaken identity, it is not error to refuse a specific instruction on the credibility of eyewitnesses when the jury receives a general instruction on the credibility of witnesses. *See, e.g., People v. Fuller,* 791 P.2d 702, 707 (Colo.1990); *People v. Vigil,* 718 P.2d 496, 503 (Colo.1986); *People v. Thatcher,* 638 P.2d 760, 772 (Colo.1981); *People v. Palumbo,* 192 Colo. 7, 11, 555 P.2d 521, 524 (1976).

Such a general instruction was provided the jury in both cases against the defendant, which read:
You may have to decide what testimony to believe. You should carefully consider all of the testimony given and the circumstances under which each witness has testified. Consider each witness' knowledge, motive, state of mind, demeanor, and manner while on the stand. Consider the witness' means of knowledge, ability to observe, and strength of memory. Consider also any relationship each witness may have to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case. You should consider all facts and circumstances shown by the evidence which affects the credibility of the witness' testimony.

While an overwhelming majority has favored affirming a trial court's exclusion of expert testimony on eyewitness identification, a few courts have indicated a willingness to evaluate the justification for excluding such testimony and have further recognized that the admission of this type of testimony is proper in some cases. *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983), and *People v. McDonald*, 37 Cal.3d 351, 690 P.2d 709, 208 Cal.Rptr. 236 (1984), are two state court cases that reversed the defendant's conviction, holding that the trial court prejudicially abused its discretion by excluding expert testimony on factors affecting the accuracy of eyewitness identifications.

In *Chapple*, two eyewitnesses identified the defendant as a participant in a drug deal resulting in murder one year after the crime occurred. One of those witnesses, however, failed to identify a photograph of the defendant within a week of the crime. The Arizona Supreme Court held that under the particular facts of that case, the eyewitness identifications were sufficiently suspect such that admission of the psychologist's testimony on eyewitness reliability was warranted to aid the jury in resolving the identification dispute. *Chapple*, 135 Ariz. at 296–97, 660 P.2d at 1223–24.

The court, however, restricted the impact of its opinion with the following words of caution:

> In reaching this conclusion, we do not intend to "open the gates" to a flood of expert evidence on the subject. We reach the conclusion that [the psychologist] should have been permitted to testify on the peculiar facts of this case and have no quarrel with the result reached in the vast majority of cases.... The rule in Arizona will continue to be that in the usual case we will support the trial court's discretionary ruling on admissibility of expert testimony on eyewitness identification.

*Id.* *Accord State v. McCutcheon*, 162 Ariz. 54, 56–58, 781 P.2d 31, 33–35 (1989); *State v. Poland*, 144 Ariz. 388, 398–99, 698 P.2d 183, 193–94 (1985).

In *McDonald*, the defendant was charged with murdering Jose Esparza during an attempted armed robbery at a busy intersection in downtown Long Beach, California. With at least some uncertainty, seven witnesses identified the defendant as the gunman, and one eyewitness testified that the defendant was definitely not the gunman. In concluding that, under the facts of that case, the trial court committed prejudicial error by excluding a psychologist's testimony on eyewitness reliability, the California Supreme Court advised:

> When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony.

*Id.* 37 Cal.3d at 377, 690 P.2d at 727, 208 Cal.Rptr. at 254. The court undercut this advisement, however, with a prediction that "such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." *Id.*

Several federal courts have asserted that it is sometimes appropriate to admit expert testimony on eyewitness reliability, but have refrained from reversing the defendant's conviction on that basis. In *United States v. Moore*, 786 F.2d 1308 (5th Cir. 1986), the court found that the expert testimony at issue "[was] not simply a recitation of facts available through common knowledge," but rather was "largely *counter-intuitive*," and therefore proper to admit, "at least in some cases." *Id.* at 1312 (emphasis in original). Nevertheless, the court concluded that, there being no authority mandating the admission of such testimony, the trial court had not abused its discretion in refusing to admit the evidence because, regardless of the eyewitness identifications, the evidence of

You may believe all of the testimony of a · witness, or part of it, or none of it.

guilt against the defendant was overwhelming. *Id.* at 1312–13.

Similarly, in *United States v. Smith*, 736 F.2d 1103 (6th Cir.1984), the court approved the admission of testimony by an expert in the field of eyewitness identification. *Id.* at 1105. Even though the court found that the exclusion of the psychologist's testimony may have been error, the court ruled that the error was harmless based on the government's presentation of three eyewitnesses who identified the defendant as the robber, and the government's uncontroverted evidence that the defendant's palm print was found at the crime scene. *Id.* at 1107.

An extensive examination of the problem before us also appears in *United States v. Downing*, 753 F.2d 1224 (3rd Cir.1984). There, the court held that admission of the expert testimony in question was not automatic, but must survive a threshold inquiry derived from the helpfulness standard of FRE 702, *id.* at 1226, which provides: "If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." [9] (Emphasis added.) The preliminary determination advocated by the Third Circuit, in the course of an *in limine* proceeding,

is essentially a balancing test, centering on two factors: (1) the reliability of the scientific principles upon which the expert testimony rests, hence the potential of the testimony to aid the jury in reaching an accurate resolution of a disputed issue; and (2) the likelihood that introduction of the testimony may in some way overwhelm or mislead the jury.

In addition, the court instructed that admission also depends on the "fit," that is, the offer of proof must show that the proffered scientific research is specifically tied to the particular features of the eyewitness identification at issue. *Downing*, 753 F.2d at 1226. Finally, under this test, the trial court retains its discretion under FRE 403

to exclude relevant evidence that would waste time or confuse the issues. *Id.*

The *Downing* court subsequently held that the trial court erred by ruling that expert testimony on eyewitness identification is inadmissible. *Id.* at 1232. Because eyewitness identification constituted the sole evidence against the defendant, the court concluded that the error was not harmless and remanded the case for an evidentiary hearing on the admissibility of the expert's testimony, consistent with the guidelines set forth above. *Id.* at 1243–44. *See also United States v. Sebetich*, 776 F.2d 412, 418–19 (3rd Cir.1985) (Because the government's case against the defendant rested solely on an eyewitness's identification and that identification was subject to challenge, a preliminary *Downing* hearing should have been held.).

**B.**

▆▆▆ We agree that in some cases the admission of expert testimony on the reliability of eyewitness identification may be proper, but we decline to adopt a *per se* rule of admissibility. Instead, we share the view that the trial court is in a superior position to judge the advisability of allowing such testimony and, therefore, this matter is best left to the trial court's discretion.

▆▆▆ In our view, the *Downing* court's application of Rules 702 and 403 offers a sound method for ensuring that the admission of expert testimony on the accuracy of eyewitness identification will enhance the truth-seeking function of trial. Further, the test is consistent with this court's view that CRE 702 is the appropriate standard governing the admissibility of such testimony. *See People v. Hampton*, 746 P.2d 947, 951 (Colo.1987) (CRE 702 governs admission of expert testimony on rape trauma syndrome); *People v. Romero*, 745 P.2d 1003, 1016 (Colo.1987) (post-hypnotic testimony is admissible if it "is reliable and would be helpful to the trier of fact"). *See also Weinstein's Evidence* § 702[02] (1990). We therefore hold that the trial

**9.** CRE 702 on the testimony of experts is identical to its federal counterpart, FRE 702.

court retains its broad discretion to evaluate on a case-by-case basis whether the testimony in question would "assist the trier of fact to understand the evidence or to determine a fact in issue." CRE 702. In making its determination, the court should issue specific findings on the record employing the helpfulness standard in CRE 702, as well as its discretionary authority under CRE 403 to exclude relevant evidence that "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403. Moreover, the appellate courts may not reverse the trial court's ruling to admit or exclude the expert's testimony unless the ruling is manifestly erroneous. *See People v. Williams,* 790 P.2d 796, 798 (Colo.1990). We must now determine whether the trial court erred in ruling to exclude Dr. Greene's testimony.

### C.

In concluding that Dr. Greene's testimony was inadmissible, the trial court made no mention of CRE 702. Instead, the court found that the studies relied on by Dr. Greene did not provide a "scientifically established standard" and stated that it was applying the *Frye* test to deny her testimony. We conclude that the trial court erred in relying on *Frye* as a basis for excluding Dr. Greene's proffered testimony.

In *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), the court was confronted with the admission of the results of a systolic blood pressure deception test, the precursor to polygraph testing. Since its introduction, the *Frye* standard of general acceptance within a particular scientific field has been employed as a special foundational requirement for novel scientific devices or processes involving the evaluation of physical evidence, such as lie detectors,[10] experimental systems of blood typing, voiceprints, identification of human bite marks, and microscopic analysis of gun res-

idue. *People v. Hampton,* 746 P.2d 947, 950–51 (Colo.1987). Here, however, we deal with no such scientific device or process. Rather, the testimony concerns an explanation by a psychologist on how certain factors, such as stress and post-event information, can affect memory and perception, and thus eyewitness identification. We therefore find that the trial court erred in applying *Frye*'s general acceptance standard to exclude Dr. Greene's testimony on the reliability of eyewitness identification.

Moreover, the trial court's error in relying on *Frye* was not harmless. Evaluating the admissibility of expert testimony by CRE 702's requirement that it "assist the trier of fact" is a more liberal standard than the *Frye* requirement that the proffered scientific evidence be generally accepted in the scientific community. *See Weinstein's Evidence* § 702[03], at 702–44. It is therefore necessary for the trial court to reevaluate Dr. Greene's testimony, using Rules 702 and 403 as its standard.

We remand with directions to vacate the judgment in *People v. Campbell,* No. 87CA1956 (Colo. App. Nov. 30, 1989) (unpublished opinion), with directions to remand the case to the trial court. On remand, the trial court should reevaluate the admissibility of Dr. Green's testimony under CRE 702 and 403. If her testimony is not admissible, the defendant's conviction must stand; if her testimony is admissible, a new trial would be required. We further disapprove of the court of appeals holding on this issue in *People v. Campbell,* 785 P.2d 153 (Colo.App.1989). On retrial, the trial court should reexamine the admissibility of Dr. Greene's testimony on the facts of that case in a manner consistent with this opinion.

QUINN, J., does not participate.

---

10. *See People v. Anderson,* 637 P.2d 354, 362 (Colo.1981) (evidence of polygraph test results and testimony of polygraph examiners is *per se* inadmissible at a criminal trial).