No. 115,620

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN RE ROCKHILL PAIN SPECIALISTS, P.A.,
DANIEL R. KLOSTER, M.D.,
*Appellee*,

v.

DAN L. HANCOCK, M.D.,
*Appellant*.

SYLLABUS BY THE COURT

1.

The restrictions regarding dissemination of reports and records of public health care licensing agencies contained in K.S.A. 65-4925 are a statutory exception to the general rule contained in K.S.A. 60-407 that all relevant evidence is admissible.

2.

A strict or narrow interpretation is applied to statutory exceptions to the rule contained in K.S.A. 60-407 that all relevant evidence is admissible.

3.

The plain language of K.S.A. 65-4925 does not prohibit the admission into evidence of the ultimate *result* of investigations by public health care licensing agencies.

4.

The good-faith immunity provided under K.S.A. 65-2898 for persons that report information regarding incidents of malpractice, or the qualifications, fitness or character of, or disciplinary action taken against, a person licensed, registered or certified by the

1

board of healing arts adequately protects the public interest in encouraging reporting of unfitness.

5.

Unless otherwise limited by court order, parties may obtain discovery regarding any nonprivileged matter that is relevant to a party's claim or defense and proportional to the needs of the case.

6.

A privilege is a rule of evidence that allows a person to shield confidential communications or information from compelled disclosure during litigation.

7.

Because they are exceptions to the general rule that parties may obtain discovery regarding any matter that is relevant to a party's claim or defense, evidentiary privileges are to be strictly construed.

8.

The fact that a statute identifies information as confidential does not necessarily mean that the statute has created an evidentiary privilege.

9.

The trial court is vested with broad discretion in supervising the course and scope of discovery.

10.

In discovery proceedings when a claim of privilege, confidentiality, or irrelevance is raised by a litigant, the court has a duty to conduct an in camera inspection to permit discovery of only relevant documents to protect against unnecessary and damaging

disclosure of irrelevant confidential material. The court must balance the interests of the litigants as well as the public interest in maintaining the confidentiality of the material.

11.

Findings and other records submitted to or generated by hospital peer review committees or officers are privileged and are not subject to discovery. But by statute, the holder of the privilege is the hospital peer review officer or committee creating or initially receiving the record, not the individual doctors or medical professionals submitting the record.

12.

A doctor's responses to a Kansas Board of Healing Arts investigation are confidential but not privileged under K.S.A. 65-2839a(d).

13.

Damages recoverable for defamation cannot be presumed but must be proven.

14.

Defamation is not a personal injury action as contemplated by K.S.A. 2016 Supp. 60-19a02(a).

15.

Failure to request an itemization of noneconomic damages prior to the discharge of the jury waives any claim to apply the caps on noneconomic damages in K.S.A. 2016 Supp. 60-19a02.

16.

A verdict for actual damages will not be disturbed merely because the court cannot definitely ascertain the precise method by which the jury arrived at the exact amount of its verdict when such an amount is reasonably within the range of the evidence.

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed December 22, 2017. Affirmed.

*Eric G. Kraft*, of Eric Kraft Law, LLC, of Olathe, for appellant.

*Timothy R. West* and *Nick J. Kurt*, of Berkowitz Oliver LLP, of Kansas City, Missouri, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and GREEN, JJ.

ARNOLD-BURGER, C.J.: This case represents a tragic story of two highly gifted and respected physicians, Dr. Dan Hancock and Dr. Daniel Kloster, who specialize in pain management care. They maintained a highly successful practice and each made over a half million dollars a year. They were like brothers to each other, until a dispute over money sent their friendship and their practice into a death spiral.

Following a dispute over the proposed distribution of income, Hancock began broadcasting complaints regarding Kloster's patient care to several state agencies, hospitals, and ultimately—when he believed the other entities were not responding quickly enough or in the manner he hoped—to the Kansas City Star. He alleged that Kloster was either killing or hastening the death of his patients. None of the complaints bore fruit. After hundreds of hours defending his reputation Kloster successfully sued Hancock for defamation, breach of fiduciary duty, fraud, and conversion. Hancock appeals that verdict.

On appeal, Hancock argues that the district court misapplied the statutory privilege in K.S.A. 65-4925, which provides that reports and records of state licensing agencies are confidential, by admitting evidence that two state agencies had cleared Kloster of any wrongdoing. Although we find that the district court did not err in admitting evidence that the state licensing agencies cleared Kloster of wrongdoing, it did err in holding that Kloster's submissions to the state licensing agencies were privileged. However, the error was harmless because Hancock had other ways of discovering the information. Hancock also argues that there was insufficient evidence to support the jury's damages awards for Kloster's defamation and nondefamation claims. But, the jury had a sufficient evidentiary basis to support its award of damages on all claims. Finally, Hancock argues that the damages for Kloster's defamation claim should have been capped under K.S.A. 2016 Supp. 60-19a02(b), which provides a statutory cap of $250,000 for noneconomic damages in personal injury cases. However, defamation is not a personal injury action. Additionally, he did not object to the jury's failure to itemize damages, a failure that is fatal to his claim. Accordingly, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Dr. Daniel Kloster and Dr. Dan Hancock are anesthesiologists specializing in pain management. They formed Rockhill Pain Specialists, P.A. (Rockhill) in 2001. Their practice included, among other pain management procedures, the implantation of pain pumps in terminally ill cancer patients for end-of-life pain management. At that time, they were "good friends, like brothers." Rockhill was an S-corporation, and as Kloster and Hancock were the only two shareholders of Rockhill they split all profits evenly. Kloster brought in about two-thirds of the patients while Hancock brought in the other third. Hancock handled Rockhill's business, and served as Rockhill's president, director, and compliance officer.

5

The doctors' relationship began deteriorating in 2011. The doctors had different ideas about why this occurred. Hancock maintained that he was concerned about Kloster's patient care. Kloster argued that the doctors had a monetary dispute sparked by a job offer he received from a company called Assured Pharmacy.

In 2011, Assured Pharmacy approached Kloster about a potential position as its national medical director. Kloster described the position as a business advisory role. The position entailed about 35 to 40 hours of work per month. Kloster thought he would not be expected to split profits from this position with Hancock because their agreement was only to split money earned in the practice of medicine. Hancock, however, thought that the position entailed the practice of medicine because the employment contract specified that the employee had to be a licensed physician and anesthesiologist who specialized in pain management. Kloster asked Rockhill's corporate counsel, Randy Schultz, whether he would have to share profits from the Assured Pharmacy position with Hancock. Schultz told him that he would not have to share because the position was unrelated to the practice of medicine.

Kloster and Hancock went out to dinner in December 2011. They continued to disagree over whether Kloster's earnings from Assured Pharmacy should go to Kloster or to Rockhill. Kloster said he would look at Rockhill's books and discuss the issue again with Hancock at a later point in time. Kloster had not looked at Rockhill's books before because that aspect of the business was managed by Hancock. When Kloster looked at Rockhill's books, he realized that he had brought in twice as much business as Hancock had for the previous five years.

The doctors met for another dinner in January 2012. Kloster alleges that Hancock "just went off" and started screaming at him. Kloster said that Hancock accused him of working with Schultz to deprive Rockhill of the Assured Pharmacy money and that Hancock screamed, "Oh, you're going down. Randy [Schultz] is going down." Hancock

6

denied threatening Kloster or Schultz at this meeting, and said that Kloster actually threatened him by saying he would kill Hancock if he did anything to injure Kloster's wife or children.

The parties met again briefly in March or April of 2012. Kloster asked Hancock if he would be open to a different compensation system where, instead of splitting profits evenly, they would split profits based on production. Hancock refused.

Due to the parties' disagreement on compensation, Kloster recommended that they cease receiving any distributions from Rockhill beyond their base pay. Direct deposits of $15,000 per month were given to Kloster during this time period, just like Hancock, but Kloster returned them to the corporation. Hancock continued to take distributions from Rockhill. Schultz instructed Rockhill's bookkeeper to cease making distributions until the doctors could agree on a compensation model. But Hancock emailed the bookkeeper and said that "as president of Rockhill Pain Specialists, I am instructing you to make the monthly distributions for May as you have every month for the past 4-5 years."

On June 14, 2012, Kloster called a special meeting of Rockhill's board of directors. Kloster, Hancock, and Schultz attended. Kloster and Hancock each brought a private attorney as well. Kloster raised the issue of distributions again, but Hancock continued to receive them. The parties also discussed a production-based compensation arrangement, and Kloster's attorney agreed to "prepare a proposed compensation arrangement that was partially based upon a production formula while taking into consideration any special administrative duties being provided by the parties."

After discussing compensation, Hancock raised the issue of Rockhill's billing and coding practices. The special meeting minutes state that Hancock requested a third-party review of Rockhill's billing and coding activities. The minutes also state that Hancock agreed to provide Schultz with the names of two to three physicians who could conduct

7

an independent review of Rockhill's practice. During the trial, Hancock denied that he agreed to do this. At the time of the special shareholder's meeting, neither Kloster nor Schultz knew why Hancock raised an issue with Rockhill's billing.

Although he did not disclose it at the special shareholder's meeting, Hancock had been investigating Rockhill's billing practices for several months. Hancock testified that he began having concerns with Kloster's patient care in 2011. Hancock's primary concern was with Kloster's implantation of intrathecal pain pumps in patients. These pumps are about the size of a hockey puck and are inserted under a patient's skin. Pumps provide a powerful way to deliver medicine into patients with severe pain. Hancock thought that patients receiving pumps were dying at a faster rate than usual. He thought Kloster was "either choosing patients that [were] inappropriate to receive pumps or that the concoction that he was using was hastening their demise."

Hancock was also concerned with the pain pump issue from a compliance standpoint. Medicare asks doctors to certify that they have a reasonable certainty that a patient will survive for 90 days after implantation of a pump. Hancock thought that if Kloster was selecting inappropriate patients for pump procedures that Rockhill might be subject to a Medicare audit or sanction.

In January 2012, shortly after the doctors' monetary dispute began, Hancock met Vicki Myckowiak at a conference in Scottsdale, Arizona. Myckowiak is an expert in fraud and abuse in medical billing. Hancock told Myckowiak that he had concerns over Rockhill's billing practices and Kloster's use of pain pumps. Hancock hired Myckowiak on behalf of Rockhill to conduct a review of some of Rockhill's files. Hancock sent Myckowiak records from 12 patients of Kloster's who had died within 90 days of their pump placements. These were records that Rockhill maintained for billing purposes, and did not include operating room notes or nursing notes.

8

On June 6, 2012, Hancock provided Kloster with a peer review reference. Hancock certified that he would recommend Kloster without reservations. Hancock strongly agreed that Kloster provided appropriate patient assessments, evaluations, and surgical procedures.

Shortly after the June 2012 special shareholder meeting, Myckowiak hired Dr. Andrea Trescot as an expert to conduct additional review of the records. After reviewing the records, Trescot prepared an expert report. She stated that "[a]lthough these were cancer patients, presumably with a limited life span, I am seriously concerned that the medicines that Dr. Kloster chose for the pump hastened if not caused these patients' deaths." She also said that "[r]eview of these cases force[s] me to conclude that an emergency suspension of pump implantations is necessary to protect patient welfare."

Hancock did not contact Schultz throughout his consultations with Myckowiak or Trescot. He also did not discuss Trescot's findings with Kloster. Hancock testified that he raised concerns regarding the pain pumps with Kloster as early as August 2011. He said that Kloster told him "that he could justify all of the pumps that he put in, that [Hancock] needed to be more aggressive in patient treatment and that [Hancock] should not be lecturing him about how to treat pump patients." Hancock testified that he discussed the issue with Kloster again in December 2011 or January 2012 to reinforce his previous concern that Kloster was choosing the wrong patients or being too aggressive in his treatment. Hancock alleged that Kloster said, "I'm telling you that these patients are going to die anyway and I'm going to make as much money off of them before they die as I can." At trial, Kloster denied that Hancock ever expressed any concerns over his patient care.

On August 8, 2012, Myckowiak filed complaints against Kloster with the Kansas State Board of Healing Arts and Missouri Board of Registration for the Healing Arts. These complaints stated that she was writing "on Dr. Hancock's request to provide you

9

with information showing that his partner, Daniel L. Kloster, M.D. is providing services to patients . . . that are below the standard of care and which, it appears, caused the death of at least one patient." The primary concern in the complaints regarded the implantation of intrathecal pain pumps.

Later that month, Hancock sent letters to several people at Menorah Medical Center and Research Medical Center, including the CEOs, credentials committees, and peer review committees regarding his concerns over Kloster's patient care. Hancock asked Myckowiak to send complaints to the attorneys general and governors of Missouri and Kansas, the federal Drug Enforcement Administration, the Missouri Bureau of Narcotics and Dangerous Drugs, and the Kansas Bureau of Investigation. Hancock also made an anonymous call to the Overland Park Police Department.

Kloster began thinking about dissolving Rockhill when Hancock lodged complaints against him. The doctors' business dispute continued, with Hancock accepting distributions and Kloster continuing to reject them. This led to Hancock accruing approximately $100,000 more than Kloster by September 2012. At that time, Kloster's attorney wrote a letter informing Hancock that his acceptance of the distributions breached his fiduciary duty to Rockhill and put Rockhill's S-corporation status at risk. Kloster also discovered that Hancock had used Rockhill funds to pay his personal attorney, Myckowiak, and Trescot. Kloster asked Hancock to reimburse those funds, and Hancock refused. In early 2013, Kloster withdrew $38,515.15 to equalize the doctors' distributions. Hancock responded by taking an equal amount out of Rockhill's account. Kloster responded to this by withdrawing about $42,830.13 from Rockhill—some to equalize distributions and the rest for routine expenses like gasoline and continuing medical education credits.

Throughout the business dispute, Hancock continued investigating Kloster's patient care. Hancock provided Trescot with 33 more of Kloster's patient billing records

to review. Trescot issued a second opinion in January 2013. She concluded: "This review identifies multiple cases of treatment below the standard of care, probable Medicare fraud, and, I am afraid, possibly manslaughter. In my many years of reviewing medical cases, I have rarely seen a magnitude of cases this egregious." Hancock sent Trescot's second report to the state licensing agencies to supplement his complaints against Kloster.

In March 2013, Kloster filed suit against Hancock. Kloster sued for breach of fiduciary duty, fraud, fraud through silence, conversion, defamation, and invasion of privacy by false light. Kloster also asked for judicial dissolution of Rockhill as well as an accounting and appointment of a receiver. Hancock counterclaimed for breach of fiduciary duty. Later that month the district court appointed Craig Chance as receiver for Rockhill for the pendency of the dissolution. Chance's duty was to preserve Rockhill's assets during the winding down of the company. Chance was also tasked with determining whether Kloster or Hancock made inappropriate disbursements of Rockhill funds.

At the end of March 2013, Hancock began talking to a reporter from the Kansas City Star. Hancock was frustrated when he talked to the reporter because none of the state licensing agencies, hospitals, or other parties to whom Hancock had transmitted complaints about Kloster had taken action. Hancock deemed this a "government failure" and thought that he needed to "alert the general public" to the dangers posed by Kloster's patient care. The Kansas City Star published an article titled, "When doctors divorce, the breakup can be as messy as a marital split" in June 2013. The article begins, "It sounds like the lead-in to any of 101 divorces. One partner is accused of outrageous misconduct, the other of not doing his share. There are threats, maybe shouting. The silent treatment. And underneath it all, a simmering dispute over money." The article goes on to discuss Hancock's allegations that Kloster was "practicing so far below the standard of care that two of his patients died through massive overdoses of pain medications." It also

11

contained Hancock's allegations that patients were dying too quickly after implantation of pain pumps.

Eventually, both the Missouri and Kansas licensing agencies concluded their investigations of Kloster and found that he did not violate the standard of care. In May 2014, Hancock made a motion to compel discovery responses from Kloster. Hancock sought "Kloster's written responses to the different medical boards and regulatory boards of the various hospitals and the boards of health for [the] states of Kansas and Missouri." Kloster objected, arguing that the records were confidential. The district court agreed with Kloster and held that Kloster's responses to the licensing agencies were confidential.

A couple of weeks before trial, Hancock filed a motion in limine asking the court to exclude "[e]vidence, testimony, exhibits, and/or statements regarding the conclusions, results, or any other determinations of Dr. Kloster's conduct or practice methods from any peer review process of any hospital, the Kansas Board of Healing Arts, or the Missouri State Board of Registration for the Healing Arts." Hancock argued that the conclusions of the investigations were confidential and inadmissible in court. Kloster replied, arguing that Hancock waived any right to the privilege of confidentiality in the content of the administrative proceedings when Hancock publicized the proceedings in court documents and in the newspaper. The district court denied Hancock's motion in limine, holding that Hancock waived any confidentiality that may exist in the conclusions.

At trial, Kloster and Hancock both testified. Chance, the court-appointed receiver, presented his findings. Chance testified that Hancock had incurred unsubstantiated travel costs, fuel charges, and other expenses. Chance also thought it was inappropriate for Rockhill to pay Myckowiak, Trescot, and Hancock's personal attorney fees.

The jury found in favor of Kloster on all counts. It awarded Kloster $925,000 for defamation, $63,343.11 for breach of fiduciary duty, $9,083.75 for fraud, and $9,269.60

12

for conversion. The jury also found that Hancock should pay punitive damages. The district court later awarded Kloster $200,000 in punitive damages and $9,337.02 in costs. The jury also found that Kloster breached his fiduciary duty to Hancock. However, it did not award Hancock damages for the breach.

Hancock filed a motion for a new trial. He argued that there was no evidence to support the jury's award for defamation. Alternatively, he argued that the district court should reduce the jury's defamation award because there is a $250,000 statutory cap on damages for actions involving personal injury. Hancock also argued that the jury failed to acknowledge the distinction between Kloster and Rockhill when apportioning damages. Finally, he reiterated his evidentiary arguments about the admission and exclusion of certain documents generated by the state health boards when they investigated Kloster. The district court denied Hancock's motion.

Hancock appealed.

ANALYSIS

*The district court did not err in admitting the final results of the investigations by the Kansas and Missouri boards of health.*

Hancock's first argument is that the district court erred by permitting Kloster to admit evidence that the Kansas and Missouri boards of health dismissed Hancock's complaint against him. Hancock argues that the district court's ruling "contravened well-established Kansas and Missouri public policy." He argues that Kansas and Missouri law provide civil immunity for persons who report malpractice to the state boards of health. Additionally, he argues that Kansas law prohibits admitting reports generated during the administrative disciplinary process into evidence. In sum, he contends that the letters from the disciplinary boards are inadmissible as a matter of law.

13

Generally speaking, all relevant evidence is admissible. K.S.A. 60-407(f); see K.S.A. 60-401(b). But a court's consideration of the admissibility of evidence can also require application of statutory rules controlling the admission and exclusion of certain types of evidence. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). Accordingly, an appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence. 299 Kan. at 349.

*Preservation*

Before reaching the substantive issue, we must address a preservation issue. Kloster argues that this court is precluded from reviewing Hancock's evidentiary argument because Hancock failed to lodge a timely objection to Kloster's testimony regarding the results of the boards' investigations. Kloster relies on the following line of questioning from his direct examination on the first day of trial:

"Q: Besides the complaints that were lodged by Dr. Hancock that we'll hear about, do you have any other complaints made to the State Boards of Healing Arts concerning your patient care?

"A: I have not.

"Q: Okay.

Are you currently under investigation by either Missouri or Kansas State Boards of Healing Arts?

"A: I am not.

"Q: Have your licenses to practice medicine ever been suspended or limited in any way or restricted?

"A: No.

"Q: You remain in good standing both with the State of Missouri and the State of Kansas?

"A: Correct.

"Q: Have you ever had your privileges suspended at any hospital?

14

"A: Never."

Hancock did not object to this line of questioning. While this discussion approaches the topic of the boards' results, the boards' conclusions were not directly addressed. Thus, Hancock was not required to object at that point to preserve this issue for appeal. On the second day of trial, Kloster's attorney was still examining him. The attorney stated: "I want to talk to you about the conclusion of the state board investigations into Dr. Trescot's report." Hancock's attorney objected, and the court said that the objection was preserved but overruled. Because Hancock objected when the conclusions of the boards' investigations were raised, Hancock has properly preserved it for our review.

*Statutory Interpretation*

Hancock relies on K.S.A. 65-4925 to support his argument that the results of the Kansas and Missouri boards' investigations were inadmissible as evidence in his case. This statute provides:

"(a) The reports and records made pursuant to K.S.A. 65-4923 or 65-4924, and amendments thereto, shall be confidential and privileged, including:

(1) Reports and records of executive or review committees of medical care facilities or of a professional society or organization;

(2) reports and records of the chief of the medical staff, chief administrative officer or risk manager of a medical care facility;

(3) reports and records of any state licensing agency or impaired provider committee of a professional society or organization; and

(4) reports made pursuant to this act to or by a medical care facility risk manager, any committee, the board of directors, administrative officer or any consultant.

"Such reports and records shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity and shall not be admissible in any civil or administrative action other than a disciplinary proceeding by the appropriate state licensing agency." K.S.A. 65-4925.

15

The statute clearly establishes a privilege regarding the use of reports and records generated by a state licensing agency during the agency's investigatory process. Additionally, the statute protects reports and records from "any state licensing agency" so both Kansas' and Missouri's board reports and records are protected. K.S.A. 65-4925(a)(3).

At trial, Kloster testified that the Kansas board "exonerated" him, and that it did not find evidence that Kloster had violated the standard of care. He also testified that the Missouri board closed his case because there was insufficient evidence that he violated the rules of his profession. Kloster introduced a letter from the Missouri, but not Kansas, board as an exhibit. It read:

"Dear Licensee:

"The Missouri State Board of Registration for the Healing Arts has completed its review of the complaint filed against you by Vicki Myckowiak, Esq. After careful consideration of the information available to the Board at this time, the Board has voted to close this case since there appears to be insufficient evidence of a violation of the statutes and rules regulating your profession."

The issue is determining whether Kloster's testimony or the letter violate the prohibition on admitting reports and records of a state licensing agency. Kansas courts have not had an opportunity to address this issue. Few courts have discussed the privilege in K.S.A. 65-4925 at all, and most references to the statute are in federal court decisions.

The general rule regarding the admission of evidence in Kansas courts is longstanding and clear. "Except as otherwise provided by statute . . . all relevant evidence is admissible." K.S.A. 60-407. The restrictions contained in K.S.A. 65-4925 are a statutory exception to this general rule. "[O]rdinarily a strict or narrow interpretation is applied to statutory exceptions." *Broadhurst Foundation v. New Hope Baptist Society*,

16

194 Kan. 40, 44, 397 P.2d 360 (1964). The United States Supreme Court has explained that evidentiary privileges should be "strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel v. United States*, 445 U.S. 40, 50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980). This is because "'the public . . . has a right to every man's evidence.'" *United States v. Bryan*, 339 U.S. 323, 331, 70 S. Ct. 724, 94 L. Ed. 884 (1950) (quoting Wigmore, Evidence § 2192 [3d ed.]).

Kloster argues that K.S.A. 65-4925 "does not prohibit testimony about the ultimate outcome of the investigation." We agree. The plain language of K.S.A. 65-4925 does not prohibit the discussion of the ultimate *result* of an investigation by a public health care licensing agency. K.S.A. 65-4925 does not define the words "report" or "record." Given the public policy behind statutory evidentiary exceptions, the terms should be interpreted narrowly. Black's Law Dictionary defines "report" as "[a] formal oral or written presentation of facts or a recommendation for action." Black's Law Dictionary 1492 (10th ed. 2014). It defines "record" as "[a] documentary account of past events, usu. designed to memorialize those events." Black's Law Dictionary 1465 (10th ed. 2014). There were no specific facts or recommendations in the boards' communications to Kloster. The letters also did not document the proceedings of the boards. Rather, the boards simply informed Kloster that there was insufficient evidence to continue investigating Hancock's complaints.

Moreover, the argument that the boards' conclusions are not protected by K.S.A. 65-4925 is supported by the boards' websites. Both Kansas and Missouri publish disciplinary actions taken against doctors. See 2017 Board Actions, Kansas State Board of Healing Arts, *2017 Board Actions*, http://www.ksbha.org/boardactions/boardactions.shtml (last visited Sept. 11, 2017);

17

Missouri State Board of Registration for the Healing Arts, *Disciplinary/Miscellaneous Actions Taken* http://pr.mo.gov/boards/healingarts/Disciplinary%20Miscellaneous%20Report.pdf (last visited Sept. 11, 2017). See K.S.A. 60-409(b)(4) (judicial notice may be taken of specific facts capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy); K.S.A. 60-412(c) (reviewing court in its discretion may take judicial notice of any matter specified in K.S.A. 60-409 whether or not judicially noticed by district court). If publicizing the boards' negative findings is not prohibited by K.S.A. 65-4925, it follows that publicizing the boards' positive findings is also not prohibited.

Hancock argues that the district court's decision violates public policy because "[a]llowing the statute prohibiting disclosure of these records to be so easily disregarded will chill all future complainants against physicians." However, this argument is misguided. K.S.A. 65-2898 provides civil immunity to any "person reporting to the state board of healing arts in good faith." This statute provides ample protection to persons reporting misconduct, as long as the report is made in good faith. The district court instructed the jury on good faith as follows:

> "If you believe that Dr. Hancock reported to the State Board of Healing Arts in good faith any information that he had relating to alleged incidents of malpractice, or the qualifications, fitness or character of Dr. Kloster, then that report cannot be the basis for any damages awarded to Dr. Kloster."

The good-faith immunity provided under K.S.A. 65-2898 for persons that report information regarding incidents of malpractice, or the qualifications, fitness or character of, or disciplinary action taken against, a person licensed, registered or certified by the board of healing arts adequately protects the public interest in encouraging reporting of unfitness.

18

The plain language of K.S.A. 65-4925 does not prohibit Kloster from testifying that the state boards dismissed Hancock's complaints against him. Thus, the district court did not err by admitting the evidence.

However, even if we were to conclude that the boards' results are privileged the error is subject to the harmless error analysis. K.S.A. 2016 Supp. 60-261. Where an error implicates a statutory right, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Hancock does not attempt to explain why this purported error entitled him to a new trial. Kloster, however, has provided persuasive reasons why any error in admitting the boards' conclusions is harmless in this case. Throughout the trial, Hancock made references to his displeasure with the boards' findings. For example, he stated that he had a difficult time "comprehending and accepting" the fact that Missouri would not be "concerned about the deaths of several patients after they had had an implantable pump surgically implanted in their body." Hancock also testified that he disagreed with the conclusions of the Kansas board and that its members were not qualified to review patients who were treated with pain pumps. Additionally, Hancock accused the CEO of Menorah Hospital of being biased in favor of Kloster when it did not restrict Kloster's privileges. Hancock also testified that he went to the Kansas City Star in March 2013 because he was frustrated that none of the organizations and persons to whom Hancock had transmitted complaints about Kloster had taken action. Even without the letters, a jury listening to Hancock's testimony could have deduced that the state boards did not sanction Kloster.

Furthermore, Kloster testified that (1) he was not currently under investigation by the Missouri or Kansas State boards of health; (2) his licenses to practice medicine had

19

never been suspended, limited, or restricted in any way; (3) he remained in good standing in both Kansas and Missouri; and (4) he had never had his privileges suspended from any hospital. This testimony also gave the jury a reasonable basis to conclude that Kloster was not sanctioned by the state boards, regardless of whether the boards' direct conclusions were admitted at trial.

*Conclusion*

The results of the Kansas and Missouri boards' investigations are not privileged reports or records under K.S.A. 65-4925. Even if they were and their admission was in error, the error is harmless in light of testimony from both parties from which the jury could reasonably infer that Kloster was cleared of wrongdoing by the boards.

*The district court erred in denying Hancock's discovery request, but the error was harmless.*

Hancock's next argument is that the district court erred by refusing to allow him to discover the documents Kloster provided to the Kansas and Missouri boards of health. He argues that exclusion of this evidence was unfair because "Dr. Kloster was able to use the boards' favorable conclusions to buttress his argument that Dr. Hancock defamed him, while blocking any inquiry into the boards' deliberations that led to that conclusion." Hancock maintains his position that neither the boards' conclusions nor Kloster's disclosures to the boards should have been admitted into evidence. However, he argues that "having disregarded the statute and allowed the conclusions into evidence, simple fairness dictated that the court allow Dr. Hancock to discover what information Dr. Kloster was providing the boards" that resulted in their respective conclusions.

20

The standard of review for discovery issues is abuse of discretion. *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 704, 952 P.2d 1286 (1998). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). But "even under the deferential abuse of discretion standard of review, an appellate court has unlimited review of legal conclusions upon which a district court's discretionary decision is based. *State v. Ernesti*, 291 Kan. 54, 65, 239 P.3d 40 (2010). The district court held that Kloster's communications with the boards were protected by K.S.A. 65-2898(a). Whether the communications were protected by statute is an issue of law which we review de novo.

Kloster argues that this court should refuse to consider Hancock's argument because he failed to specify the place in the record where the district court ruled on this issue. Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 35) states that each issue in an appellant's brief "must begin with . . . a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." It is true that Hancock's discussion of this issue in his brief does not include a citation to the record where the district court ruled on the issue. However, he does include such a citation in his statement of facts. This court has previously held that lack of pinpoint citations is not fatal to appellate review of an issue. *State v. Allen*, 49 Kan. App. 2d 162, 168, 305 P.3d 702 (2013) ("[T]he State made the necessary citations to the record for each issue in the fact statement of its brief, rather than under the discussion of each issue. . . . [H]owever, the State provided extensive argument and relevant legal authority from which this court can research and analyze the issues."); *Davis v. State*, No. 114,436, 2016 WL 5344256, at *6 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. ___ (August 29, 2017); *State v. Briscoe*, No. 114,278, 2016 WL 2775676, at *2 (Kan. App. 2016) (unpublished opinion).

Hancock provides sufficient citations and argument to enable appellate review of this issue.

*Discussion*

Hancock sought to discover Kloster's "responses to the various medical and ethical boards" to which Hancock sent complaints. Hancock argued that he had a right to these documents because Kloster was alleging that Hancock made the complaints in bad faith. He argued that "[t]heoretically, Dr. Kloster's responses to the complaints could admit wrongdoing, which would be highly relevant to a determination of whether Dr. Hancock's complaints were in good faith." Kloster argued that the records were confidential under K.S.A. 65-2898(a). The district court held that the documents were confidential and protected by K.S.A. 65-2898(a), and that Kloster did not waive the confidentiality by discussing his responses to the boards with third parties. The district judge rejected Hancock's argument that he needed the documents to discover whether Kloster had admitted to wrongdoing, adding that it would be counterintuitive for the boards to clear Kloster of wrongdoing if he had admitted fault in his responses to the boards. The judge suggested that if Hancock wanted to discover this information he could ask Kloster what the basis of his bad-faith allegations were, whether Kloster has ever admitted to wrongdoing, or whether Kloster had ever taken diversion.

The statute cited by Kloster and the district court as the basis of the documents' confidentiality, K.S.A. 65-2898(a), does not mention confidentiality or privilege at all. It provides civil immunity to persons reporting to the state board of healing arts in good faith. K.S.A. 65-2898(a). So to determine if Kloster's responses are discoverable, we must examine several other statutes relevant to state health board and peer review committee investigations.

22

"A privilege is a rule of evidence that allows a person 'to shield [a] confidential communication or information from compelled disclosure during litigation.'" *State v. Gonzalez*, 290 Kan. 747, 757, 234 P.3d 1 (2010) (quoting Imwinkelried, The New Wigmore: Evidentiary Privileges § 1.1, p. 2 [2d ed. 2009]). Unless otherwise limited by court order, parties may obtain discovery regarding any nonprivileged matter that is relevant to a party's claim or defense and proportional to the needs of the case, K.S.A. 2016 Supp. 60-226(b). Because Kloster does not argue on appeal that the information is not relevant, we are left with a determination as to whether the information is privileged and not subject to disclosure by operation of law.

### *Responses to peer review committees*

Kloster's responses to the peer review committees are protected by K.S.A. 2016 Supp. 65-4915(b). This statute provides that "the reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers shall be privileged and shall not be subject to discovery . . . ." K.S.A. 2016 Supp. 65-4915(b). However, the statute specifies that the holder of the privilege is "[t]he peer review officer or committee creating or initially receiving the record." K.S.A. 2016 Supp. 65-4915(b). Because Kloster is not the holder of the privilege, he cannot assert it as a basis for refusing to reveal his responses to the peer review committees.

Therefore, it was error for the district court to prohibit Hancock from discovering Kloster's responses to the peer review committees absent an assertion of the privilege by the peer review committees or some separate and supportable claim of confidentiality by Kloster.

*Reports of state health boards*

The state health boards also enjoy an evidentiary privilege. The statute discussed in the previous section, K.S.A. 65-4925(a), provides that "reports and records made pursuant to K.S.A. 65-4923 or 65-4924, and amendments thereto, shall be confidential and privileged, including: . . . (3) reports and records of any state licensing agency . . . ." However, Kloster's responses were not made pursuant to K.S.A. 65-4923 or 65-4924, and they do not constitute reports or records *of* the state board as those terms have been interpreted by our Supreme Court. See *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, 164-66, 955 P.2d 1169 (1998) (citing with approval *Hill v. Sandhu*, 129 F.R.D. 548, 550 [D. Kan. 1990]; *Porter v. Snyder*, 115 F.R.D. 77, 78 [D. Kan. 1987]). We will explain further.

K.S.A. 65-4923(a) requires health care workers to report knowledge that a health care provider has committed a reportable incident. The statute does not require the health care provider accused of the reportable incident to answer the complaint. See K.S.A. 65-4923. K.S.A. 65-4924 is not relevant because it relates to physical or mental impairment of a health care provider. Finally, the information Kloster sent to the state licensing agency is not a report or record *of* that licensing agency. In *Porter*, the court examined K.S.A. 1986 Supp. 65-4925(a), which provided that "[r]eports and records of executive or review committees" were privileged. 115 F.R.D. 77-78. The court held that "[b]y its plain meaning, this does not include incident reports which are not reports *of* the review committee, but rather are contemporaneous statements of facts relating to incidents which are reviewed *by* the committee." 115 F.R.D. at 78; see also *Hill*, 129 F.R.D. at 550 (1990) (holding that the peer review privilege statute, which provided that "'the reports, statements, memorandums, proceedings, findings, and other records *of* peer review committees or officers shall be privileged' . . . clearly [did] not include reports reviewed *by* the committee").

24

Nor are Kloster's responses to the Kansas board privileged under K.S.A. 65-2839a. This statute specifically protects information submitted to the Kansas Board of Healing Arts. The statute provides:

> "Patient records, including clinical records, medical reports, laboratory statements and reports, files, films, other reports or oral statements relating to diagnostic findings or treatment of patients, information from which a patient or a patient's family might be identified, peer review or risk management records or information received and records kept by the board as a result of the investigation procedure outlined in this section shall be confidential and shall not be disclosed." K.S.A. 65-2839a(d).

Kloster's responses to the Kansas Board of Healing Arts investigation falls under this statute as "information received . . . by the board as a result of the investigation." However, the fact that such information is confidential and shall not be disclosed does not necessarily mean that the statute has created an evidentiary privilege. The other statutes we have discussed, K.S.A. 2016 Supp. 65-4915 and K.S.A. 65-4925, explicitly mention privilege and state that the information protected by the statutes is not subject to discovery. Other Kansas privilege statutes, located at K.S.A. 60-423 through K.S.A. 60-436, also specifically state that a privilege exists. The fact that K.S.A. 65-2839a does not specify that a person or entity holds the privilege further suggests that the statute does not create a privilege at all. Evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974). As is evident from the language in K.S.A. 2016 Supp. 65-4915 and K.S.A. 65-4925, the Legislature clearly knows how to create a privilege and protect information from discovery. Moreover, the Legislature uses the terms confidential and privileged separately, indicating distinct meanings. Accordingly, because K.S.A. 65-2839a does not explicitly create a privilege it does not automatically protect Kloster's responses from discovery. See *Pearson v. Miller*, 211 F.3d 57, 68 (3d Cir. 2000) ("Statutory provisions providing for duties of confidentiality do not automatically imply the creation of evidentiary privileges binding on courts."); *In re*

*Grand Jury Subpoena Dated December 17, 1996*, 148 F.3d 487, 492 (5th Cir. 1998) (holding that a statute requiring a state's agricultural loan mediation program sessions to remain confidential did not mean that the sessions were privileged); *Nguyen Da Yen v. Kissinger*, 528 F.2d 1194, 1205 (9th Cir. 1975) (holding that Immigration and Naturalization Service records were "confidential but not privileged").

We pause to note that we are not suggesting that all confidential information is discoverable. The Kansas Supreme Court has held that "the existence of a privilege is not necessary in order to limit discovery" because "[t]his is done under the court's supervisory powers over discovery pursuant to K.S.A. 60-226." *Berst v. Chipman*, 232 Kan. 180, 187, 653 P.2d 107 (1982). Under this provision, the district court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including . . . forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." K.S.A. 2016 Supp. 60-226(c)(1)(D). In striking a balance between discovery and nondisclosure, courts should consider "'the nature of the proceeding, whether the deponent is a party, whether the information sought is available from other sources, and whether the information sought goes to the heart of the claim.'" *Berst*, 232 Kan. at 188 (quoting *Richards of Rockford, Inc. v. Pacific Gas & Electric*, 71 F.R.D. 388, 390 [N.D. Cal. 1976]). Additional factors to conclude are the degree of harm that would be caused by disclosure, the type of controversy before the court, and the public interest in forbidding discovery. *Berst*, 232 Kan. at 188-89. "[W]hen a claim of privilege, confidentiality or irrelevance is raised the court has a duty to conduct an in camera inspection to separate and permit discovery of only the relevant documents, thereby protecting against unnecessary and damaging disclosure of irrelevant confidential material." 232 Kan. at 187.

In sum, given the facts as presented here, the district court abused its discretion by its blanket refusal to allow Hancock to discover Kloster's responses to the peer review committees and state boards. When faced with Hancock's discovery request and Kloster's

26

objection on the basis of confidentiality of the records, the district judge should have conducted an in camera inspection to determine the relevance and discoverability of the requested documents. But an error by the court is not grounds for disturbing a judgment unless the error affects a party's substantial rights. See K.S.A. 2016 Supp. 60-261.

The district court provided a couple of reasons why Hancock's substantial rights are not affected by exclusion of this evidence. First, the district court suggested that Hancock was free to ask Kloster whether he admitted wrongdoing to the boards in a deposition. While the court held that the actual records Kloster submitted to the boards were privileged, the underlying facts in those responses were not. At the hearing on the motion to compel discovery Hancock admitted that he had not asked Kloster directly whether Kloster had ever admitted to wrongdoing. Kloster's attorney was adamant that Kloster would deny admitting to any wrongdoing if asked about it in a deposition. Second, the district judge said that it would be "counterintuitive" for the state boards to clear Kloster of wrongdoing if he had admitted that he violated state regulations.

We agree with the district court's comments supporting a finding that it was harmless error to exclude discovery of Kloster's factual responses to the boards' investigations. Hancock had other ways of discovering the information even though he failed to pursue them. He could have asked Kloster how he responded to the complaints, in other words, what his justifications were for each challenged pump insertion. Hancock could have asked Kloster if he admitted or admits to any wrongdoing in any of the individual patient cases referred for review. He could have asked Kloster if Kloster had been placed on diversion or received any admonishments, albeit informal, related to Hancock's complaints. But there is nothing in the record to suggest that Kloster ever admitted to any wrongdoing, nor was he asked. In the absence of such fundamental requests, we cannot find that the error in disallowing discovery of the requested documents affects Hancock's substantial rights.

27

*Conclusion*

It was error for the district court to refuse to allow Hancock to discover Kloster's submissions to the state boards. However, the error was harmless in light of the fact that Hancock had other ways of discovering the information.

*Kloster sufficiently proved damages related to his defamation claim.*

Hancock argues that Kloster failed to prove damages on his defamation claim. Hancock raised this issue in his motion for a new trial. He argued that there was not "any kind of a quantifiable testimony that . . . can be used to establish how [the jury] achieved the $925,000 figure," and that the large judgment indicated passion or prejudice on behalf of the jurors. Hancock "[thought] what the jury was doing was punishing Dr. Hancock rather than remurating [*sic*] Dr. Kloster for his loss because there is just no evidence to suggest that he lost $925,000 due to this defamation." The judge then denied Hancock's motion, holding that he did not prove that the jury verdict was a result of passion or prejudice.

An appellate court reviews the trial court's decision on a motion for new trial for an abuse of discretion. *City of Mission Hills v. Sexton*, 284 Kan. 414, 421, 160 P.3d 812 (2007). An abuse of discretion occurs if judicial action is either: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

Generally, "a verdict will be set aside as contrary to law where, under the evidence, the verdict is contrary to the instructions given by the trial court." *City of Mission Hills*, 284 Kan. at 421. "A new trial will not be granted, however, on mere allegations. There must be evidence that 'the jury consciously conspired to undermine the jury process by ignoring the instructions. Otherwise, it must be presumed that the jury has

28

properly determined the before and after values before arriving at damages.'" 284 Kan. at 422.

Here, the jury was instructed:

"Instruction No. 18. Defamation is communication to a person of false information tending to deprive another of the benefits of public confidence and social acceptance.

"Instruction No. 19. If you find that the communication was defamatory and the facts and circumstances surrounding the making of it resulted in injury and harm to the reputation of the plaintiff, then you should award the plaintiff such amount that will compensate plaintiff for the *damage the evidence shows plaintiff sustained*." (Emphasis added.)

Hancock argues that the jury failed to follow the jury instructions because it compensated Kloster for damages that Kloster failed to prove.

"The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed." *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 276, 50 P.3d 495 (2002). "[D]amage to one's reputation is the essence and gravamen of an action for defamation." *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 6, 649 P.2d 1239 (1982). "Proof of such damages typically entails showing that persons were deterred from associating with the plaintiff, that the plaintiff's reputation had been lowered in the community, or that the plaintiff's profession suffered." *Ali v. Douglas Cable Communications*, 929 F. Supp. 1362, 1385 (D. Kan. 1996). "Damage to reputation can be inferred from the evidence so long as the inference is reasonable." *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1072 (D. Kan. 2006) (citing *Moran v. State*, 267 Kan. 583, 590, 985 P.2d 127 [1999]). Additionally, "[a] victim's own observations may be suitable as proof of harm to his

reputation for defamation cases in Kansas . . . but they must raise a reasonable inference that the damage was caused by the plaintiff's statements. [Citation omitted.]" *Debord v. Mercy Health System of Kansas, Inc.*, 860 F. Supp. 2d 1263, 1283 (D. Kan. 2012). However, "[b]road and factually unsupported allegations . . . do not support a claim for damages for alleged defamation." *Davis v. Hildyard*, 34 Kan. App. 2d 22, 30, 113 P.3d 827 (2005).

The parties first dispute whether Kloster had to prove actual damages, or whether he could rely on a theory of presumed damages. Kloster argues that plaintiffs can rely on a theory of presumed damages. He cites *Moran*, in which the Kansas Supreme Court stated that it "ha[d] not squarely decided whether in Kansas any and all defamation plaintiffs must allege and prove actual damages rather than relying on the theory of presumed damages." *Moran*, 267 Kan. at 598. However, on the next page of the *Moran* opinion the court did decide the issue. The court held that in light of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), "[d]amages recoverable for defamation, whether per se or not, could no longer be presumed but must be proven." 267 Kan. at 599; see also *Wright v. Bachmurski*, 29 Kan. App. 2d 595, 600, 29 P.3d 979 (2001) ("In Kansas, any plaintiff in a defamation action must allege and prove actual damages and may no longer rely on the theory of presumed damages."); *Debord*, 860 F. Supp. 2d at 1280 ("Damages recoverable for defamation cannot be presumed but must be proven."); *Sunlight Saunas, Inc.*, 427 F. Supp. 2d at 1072 ("In Kansas, damages for defamation may not be presumed but must be established by proof of actual damages.").

Although the trial was five days long, Kloster's testimony regarding damages from defamation was brief. Kloster testified that he had to take time out of his practice to respond to Hancock's complaints to the state boards and others. Kloster did not keep track of the time it took him to deal with the complaints, but he would "guess in the hundreds of hours." He testified that even though Hancock's expert witness only spent six hours

30

reviewing the audited cases, Kloster went through numerous boxes of medical records, met with the Chief Executive Officers of each hospital, the peer review committees, and the state licensing boards. As to the value of his time, it was undisputed that each doctor earned in excess of $500,000 per year. Kloster also testified that he received questions from patients about the Kansas City Star article and that his patients "felt bad for [him]" and "wanted to make sure [he] was okay." Kloster went to Florida to serve on an advisory panel and said that his colleagues, including physicians from the Cleveland Clinic and Johns Hopkins, were aware of the article. Kloster said he was unable to determine the impact of the article on his practice because there was no way for him to determine whether people were intimidated by the article. However, he did present a letter from his malpractice insurer showing that the insurer refused to renew Rockhill's insurance because of the article and indicating that other anesthesiologists would not be comfortable sharing the insurance risk with him. This letter states in part:

> "Moreover, in our opinion, Dr. Hancock has unnecessarily undermined PPM's defense of his former partner, Daniel Kloster, M.D., due to what we would characterize as a bitter business dispute surrounding the dissolution of Rockhill Pain Specialists, P.A. As you are undoubtedly aware, this dispute was the subject of an article in the Kansas City Star dated June 30, 2013 entitled, 'When Doctors Divorce, the Breakup can be as Messy as a Marital Split.' The content of this article casts both Drs. Hancock and Kloster in a negative light and, in our opinion, increases the likelihood of future litigation against both physicians and their former group.

> "Finally, our underwriting standards at PPM focus on insuring 'preferred physicians', individuals with whom other anesthesiologists are comfortable sharing risk. Regardless of Dr. Hancock's motives, we do not believe the atmosphere surrounding their former practice presents a risk profile that other anesthesiologists we insure should be asked to share."

Finally, Kloster testified that he had never had any complaints or malpractice claims filed against him prior to Hancock's accusations. But after the accusations, the heirs of one of

31

the patients Hancock reported on filed a malpractice claim against Kloster. Hancock testified that despite his reports to various boards, he did not know whether the installation of the pump was found to have caused the patient's death. The jury could easily and properly infer that this claim would not have been made but for Hancock's accusations against Kloster in a variety of forms.

Hancock propounds several ways that Kloster's evidence is too weak to support an award of actual damages. He notes that Kloster could not specify exactly how much time he spent responding to Hancock's complaints. Kloster did not testify that he lost patients or referrals. In fact, Kloster's testimony about his patients' reactions to the Kansas City Star article showed that they all still held him in high esteem. The same is true regarding the reactions of other doctors with whom Kloster interacted. Hancock also notes that Kloster did not lose any privileges from hospitals or the state licensing boards, which further shows that his reputation was not damaged. Finally, Hancock discounts the letter from Rockhill's malpractice insurer by noting that Kloster was later able to secure new malpractice insurance.

The issue is determining whether the district court abused its discretion in finding that the jury followed its instruction to award damages that the evidence shows Kloster sustained. Hancock makes good points about Kloster's testimony regarding comments from his patients and other physicians. From this testimony alone, it would appear that Kloster did not prove harm to his reputation. However, the testimony did help establish that knowledge of Hancock's allegations was widespread. A jury could make a reasonable inference that widespread accusations that Kloster killed patients could harm Kloster's reputation. As Kloster explained at trial, it would be difficult for him to present direct evidence that patients were deterred from seeking him out because he would not have come into contact with those patients.

Kloster's evidence regarding the time it took him to respond to Hancock's complaints could have been stronger. He did testify that it probably took him hundreds of hours to respond to the complaints, but he did not quantify his time or translate the time into lost earnings. But, in *Gertz* the Supreme Court said that "all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." 418 U.S. at 350. Kloster's testimony provided the jury with competent evidence to conclude that Kloster suffered damages. Kloster was an anesthesiologist in a lucrative industry—it was reasonable for the jury to conclude that he suffered damages as a result of lost time dealing with Hancock's complaints.

Kloster's letter from his malpractice insurer was the clearest evidence that his reputation had been harmed and that the harm was caused by Hancock. The letter directly states that Hancock "unnecessarily undermined" the insurer's defense of Kloster. The letter also shows that the Kansas City Star article "casts both Drs. Hancock and Kloster in a negative light." Finally, the insurer did not think that other anesthesiologists would feel comfortable sharing risk with Kloster and Hancock. The letter demonstrates that Hancock's complaints caused actual harm to Kloster's reputation.

Finally, the fact that no malpractice cases had been filed against Kloster before the accusations, but a malpractice suit was filed by one of Kloster's patients who Hancock targeted after his accusations, would also lead the jury to conclude that there was actual damage to Kloster's reputation.

*Conclusion*

The district court did not abuse its discretion in refusing to grant Hancock a new trial on this issue. The jury heard sufficient evidence to support an award of actual damages to Kloster.

33

*Because Hancock fails to establish that defamation is a personal injury action, the district court did not err in failing to reduce Kloster's award to the $250,000 statutory cap established in K.S.A. 2016 Supp. 60-19a02.*

Hancock argued for the first time in his motion for a new trial that the jury's award for defamation should be reduced to $250,000. He bases his argument on K.S.A. 2016 Supp. 60-19a02, which provides a statutory cap of $250,000 on noneconomic damages in personal injury actions. Kloster argues that defamation is not a personal injury action covered by K.S.A. 2016 Supp. 60-19a02, and that even if it was Hancock failed to request an itemization of damages.

This court reviews the trial court's decision on a motion for new trial for an abuse of discretion. *City of Mission Hills*, 284 Kan. at 421. An abuse of discretion occurs if judicial action is either: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Ward*, 292 Kan. at 550.

A "personal injury action" is defined as "any action seeking damages for personal injury or death." K.S.A. 2016 Supp. 60-19a02(a). It does not appear that Kansas courts have decided whether defamation constitutes a personal injury action for the purposes of K.S.A. 2016 Supp. 60-19a02.

Hancock provides no citation for his contention that defamation constitutes a personal injury action. His argument is limited to the following: "A defamation action qualifies as a 'personal injury action.' Kansas law makes clear that 'personal injury actions' are not restricted to negligence." He cites *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 493-94, 856 P.2d 906 (1993), which held that "personal injury actions" were not restricted to negligence. *Peppermint Twist* does not stand for the proposition that defamation is a personal injury action. "A failure to support an argument with pertinent authority or to show why the argument is sound despite a lack of supporting authority . . .

34

is akin to failing to brief the issue. Therefore, an argument that is not supported with pertinent authority is deemed waived and abandoned." *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013). It cannot be said that the district court abused its discretion in refusing to apply K.S.A. 2016 Supp. 60-19a02 when Hancock failed to provide the court with authority that defamation is a personal injury action as that term is used in K.S.A. 2016 Supp. 60-19a02(a).

Furthermore, the Kansas Supreme Court has suggested that defamation is not a personal injury action. In *Valadez v. Emmis Communications*, 290 Kan. 472, 229 P.3d 389 (2010), the Kansas Supreme Court had to determine whether a claim for defamation survived the death of the plaintiff making the claim. The court examined K.S.A. 60-1801, which provided that a cause of action for injury to the person survives that person's death. It then held that "[d]efamation is similar to invasion of privacy, in that there is no requirement of proof of personal injury that would allow the action to survive under K.S.A. 60-1801." 290 Kan. at 480.

Finally, when examined in the criminal context, the crime of criminal false communication, which is the equivalent of civil defamation, has been designated by the Legislature as a nonperson misdemeanor, indicating it is not a crime which would inflict, or could inflict, physical or emotional harm to another generally. K.S.A. 2016 Supp. 21-6103(b); *State v. Waggoner*, 51 Kan. App. 2d 144, 154-55, 343 P.3d 530 (2015), *rev. denied* 303 Kan. 1081 (2015).

Accordingly, we conclude that defamation is not a personal injury action as contemplated by K.S.A. 2016 Supp. 60-19a02(a).

But even assuming K.S.A. 2016 Supp. 60-19a02 did apply to defamation, Hancock faces another hurdle to his claim that Kloster's damages should be capped under the statute—he failed to request an itemization of noneconomic damages. K.S.A. 2016

Supp. 60-19a02(c) provides: "In every personal injury action, the verdict shall be itemized by the trier of fact to reflect the amount awarded for noneconomic loss." In cases applying the statute, the jury itemized the damages. See, e.g., *Natalini v. Little*, 278 Kan. 140, 142, 92 P.3d 567 (2004); *Hilburn v. Enerpipe, Ltd.*, 52 Kan. App. 2d 546, 548-49, 370 P.3d 428 (2016) ("After hearing all the evidence, the jury returned a verdict of $335,000 in total damages for Hilburn; $301,509.14 constituted noneconomic loss damages. Pursuant to our Kansas damages cap statute, K.S.A. 2016 Supp. 60-19a02, the district court reduced the amount of noneconomic loss damages to $250,000."), *rev. granted* 306 Kan. ___ (August 24, 2017); *Lundeen v. Lentell*, No. 114,494, 2017 WL 2833984, at *5 (Kan. App. 2017) (unpublished opinion) ("The jury awarded damages of $85,514.33 for medical expenses, $35,000 for economic loss, and $2,000,000 for noneconomic loss. The court reduced the verdict to $322,308.59 after applying the comparative fault of the parties and the statutory cap of $250,000 for noneconomic damages.").

Kloster cites *Sultani v. Bungard*, 35 Kan. App. 2d 495, 497, 131 P.3d 1264 (2006), to support his argument that Hancock waived the right to assert the statute. There, the Sultanis brought a wrongful death action against April Bungard. The jury awarded $11,000 in damages to the Sultanis but found that they should receive $0 in noneconomic damages. The district court "offered the Sultanis the option to require the jury to resume deliberations to consider an award for noneconomic damages." 35 Kan. App. 2d at 496. The Sultanis declined the district court's offer and accepted the jury verdict. Later, the Sultanis moved for a new trial, "arguing that the jury's failure to award noneconomic damages was contrary to the evidence presented at trial." 35 Kan. App. 2d at 497. The trial court denied the Sultanis' motion, holding "that they had waived their right to a new trial by declining to require the jury to resume deliberations for an award of noneconomic damages." 35 Kan. App. 2d at 497. The Sultanis appealed. The Court of Appeals affirmed the district court, holding that "[t]he Sultanis' conduct in declining to have the jury return to deliberations and in accepting the verdict constituted a waiver of any right they might

36

have had to recover noneconomic damages in their wrongful death action." 35 Kan. App. 2d at 498.

It does not appear that Kansas courts have determined whether waiver applies to K.S.A. 2016 Supp. 60-19a02. However, the caselaw related to waiver of other verdict issues suggests that Hancock waived his right to request a new trial on this issue by failing to object to the jury's verdict before the jury was discharged.

*Banbery v. Lewis*, 173 Kan. 59, 244 P.2d 202 (1952), involved a three-way car collision. The plaintiff, Frederick Banbery, sued J.A. Lewis and Alfred Noone, alleging that their negligence caused the collision. Noone had struck Lewis, causing Lewis' car and trailer to swerve into Banbery's lane on the highway. Noone and Lewis filed cross-petitions against each other, each alleging that the other acted negligently. The court submitted seven verdict forms to the jury, "some of which related to the liability of [Lewis] and [Noone] as between themselves," but "the jury returned but one general verdict in which it found [Lewis] and [Noone] jointly liable." 173 Kan. at 68. Lewis did not object to the verdict. On appeal, Lewis argued that he should be granted a new trial against Noone because the jury never decided his cross-petition against Noone. The Kansas Supreme Court rejected this argument, holding: "The record fails to disclose [Lewis] made any objection to the verdict until after the jury was discharged. In that situation he is deemed to have waived any objections he might have thereto and cannot urge them for the first time upon a motion for a new trial or on appeal." 173 Kan. at 68.

This rule was reiterated in several later cases. See, e.g., *City of Olathe v. Stott*, 253 Kan. 687, 703, 861 P.2d 1287 (1993) ("The landowners did not object to the verdict at trial and did not preserve this issue for appeal. We have held that absent an objection before the jury is discharged, a party cannot later assert an objection to the verdict."); *Kitchen v. Lasley Co.*, 186 Kan. 24, 28, 348 P.2d 588 (1960) (holding that it is an "established rule of this jurisdiction that, absent any objection to a verdict until after the

37

jury is discharged, a litigant is deemed to have waived any objections he might have thereto and cannot urge them for the first time upon a motion for a new trial or on appeal"); *Watkins Co. v. Hanson*, 185 Kan. 758, 763, 347 P.2d 447 (1959) ("[T]his court is committed to the rule that, absent any objections to a verdict until after the jury is discharged, a litigant is deemed to have waived any objections he might have thereto and cannot urge them for the first time upon a motion for a new trial or on appeal."). "The rule requiring an objection if there is some ambiguity serves the objective of avoiding the expense and additional time for a new trial by having the jury which heard the facts clarify the ambiguity while it is able to do so." *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1083 (Utah 1985); see *Kitchen*, 186 Kan. at 28-29.

Issues of alleged juror misconduct can also be waived. "'[W]here alleged juror misconduct claimed as prejudicial is known by the party or his counsel before the verdict is rendered, and no objection is made nor is the matter brought to the court's attention, the party cannot later assert the misconduct as grounds for a new trial.'" *State v. Wheaton*, 240 Kan. 345, 354, 729 P.2d 1183 (1986). The reasons for this rule are as follows:

> "'If the alleged misconduct is brought to the court's attention a hearing may be held and the situation remedied, if that is possible. If not, a mistrial may be declared immediately without wasting the time and expense required to complete the trial. The rule is a corollary of the contemporaneous objection rule as to evidence and the requirement of an objection to erroneous instructions. A party is not permitted to remain silent in the face of known error, gamble on the verdict, and show his hole card only if he loses. [Citations omitted.]'" 240 Kan. at 354 (quoting *State v. Buggs*, 219 Kan. 203, 208, 547 P.2d 720 [1976]).

Similar principles are at play here. If Hancock had an objection to the court's failure to itemize the jury's verdict form, he should have objected before the jury was discharged. He should not now receive a new trial, and thus a chance at reducing the damages award, because of his failure to object to the verdict at the appropriate time.

38

*Conclusion*

While Hancock argues that defamation is a personal injury action, and thus subject to the statutory cap in K.S.A. 2016 Supp. 60-19a02, he fails to support his argument with pertinent authority. Thus, he has failed to adequately brief this issue. Furthermore, defamation does not require proof of personal injury so the statute does not apply to defamation claims. Even if K.S.A. 2016 Supp. 60-19a02 applied to defamation claims, Hancock did not object to the jury's failure to itemize damages in the verdict. By failing to request that the jury itemize damages, Hancock waived his right to apply K.S.A. 2016 Supp. 60-19a02.

*The damages award for nondefamation claims did not ignore the distinction between Kloster and Rockhill.*

Hancock's final argument is that the jury's award for Kloster's claims of breach of fiduciary duty, fraud, fraud by silence, and conversion ignored the distinction between Kloster and Rockhill. The jury awarded Kloster $63,343.11 for breach of fiduciary duty, $9,083.75 for fraud, and $9,269.60 for conversion. Hancock argues that Kloster's "evidence of damages rested on calculations made by the receiver . . . [b]ut the receiver's report plainly indicates the amounts used to calculate damages were in fact owed to Rockhill, not Dr. Kloster personally." He points to the fact that the jury's award for fraud was $9,083.75 and argues that the number "almost certainly is based" on Hancock's $5,083.75 payment for his personal health insurance plus $4,000 obtained from a severance payment Hancock made. Because these sums were due to Rockhill, based on the 50-50 distribution of income and expenses, Hancock contends that Kloster would only be entitled to half those amounts. Accordingly, he asserts that the jury ignored the distinction between Kloster and Rockhill. Kloster argues that the jury's award was "well within the range of proof offered" at trial.

39

Hancock first raised this issue in his motion for a new trial. As stated above, this court reviews the trial court's decision on a motion for new trial for an abuse of discretion. *City of Mission Hills*, 284 Kan. at 421. An abuse of discretion occurs if judicial action is either: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Ward*, 292 Kan. at 550.

Kloster presented several bases for damages on each of his claims. For breach of fiduciary duty, Kloster argued that he should receive damages for Hancock's (1) distribution of Rockhill's profits in 2012 and 2013 when the parties did not agree how to distribute the profits, (2) diversion of Rockhill funds for his own benefit, (3) making bonus and severance payments to his wife when Rockhill was winding down, (4) concealing his improper use of Rockhill's funds, and (5) making malicious attacks against Kloster. Kloster argued similar bases for damages in his conversion claim. For fraud and fraud by silence, Kloster argued that he was damaged when Hancock used Rockhill funds for personal expenses and concealed that fact from Kloster.

Kloster relied on the receiver's report as evidence of his damages. The report contained an analysis of the doctors' credit card charges, and determined that between 2010 and 2012 Hancock accrued $32,609.50 in disallowed expenses for office supplies, automobile expenses, clothing, meals and entertainment, and travel. The receiver also disallowed $24,827.96 in expenses for Hancock's payments to Myckowiak, Trescott, and his personal law firm. The receiver also took issue with bonus and severance payments that Hancock made to various employees during Rockhill's winding down process. The doctors had not agreed on severance payments, but Hancock paid $34,704 in severance to three employees. Hancock also made $37,223.38 in bonus payments that were not approved by Kloster. Assuming these funds were paid back to Rockhill and split between the partners, Kloster would receive $64,682.42. Kloster also asked for damages that were not quantified in the receiver's report, such as damages for Hancock's concealment of his use of Rockhill funds.

40

"[I]f a verdict is supported by substantial evidence it will not be disturbed on appeal." *Diefenbach v. State Highway Commission*, 195 Kan. 445, 447, 407 P.2d 228 (1965). A verdict for actual damages will not be "disturbed merely because this court cannot definitely ascertain the precise method by which the jury arrived at the exact amount of its verdict when such an amount is reasonably within the range of the evidence." 195 Kan. at 447. The jury's total award of $81,696.46 for Kloster's nondefamation claims is supported by the evidence. The receiver's report, the doctors' dispute over compensation, and Kloster's claims for damages outside the scope of the receiver's report provide sufficient evidence to conclude that the district court did not abuse its discretion in refusing to grant Hancock a new trial on this basis.

Affirmed.